# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| ALBERTA LOUISE PERRY, surviving spouse and next kin of VINCENT MCKINNEY, deceased,<br>    Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | No. 3:21-CV-00414-KAC-JEM<br>JURY DEMAND |
| JENKINS & STILES, LLC,<br>    Defendant. | ) ) | |

## RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS

There is no evidence that Jenkins & Stiles intentionally or negligently destroyed evidence in this matter. Plaintiff is cherry-picking selections of deposition testimony often taken out of context and over the objection of Defendant's counsel to make arguments not supported by the record. Plaintiff disregards expert opinions, witness statements, and other evidence that does not fit Plaintiff's narrow agenda of confusing and enflaming the jury and prejudicing Defendant. Plaintiff is attempting to distract the Court and the jury with an imagined conspiracy among Defendant, its employees, its counsel, and its expert to falsify, destroy, or conceal evidence. Plaintiff seemingly wants the jury to only hear evidence supporting the Plaintiff's claims, and no evidence supporting Defendant's defenses. Plaintiff's arguments have no merit, and the Court should deny Plaintiff's Motion in its entirety.

## I.      FACTS AND PROCEDURAL HISTORY

### a. Vincent McKinney arrived with building materials and unstrapped his load.

On April 15, 2021, Vincent McKinney delivered a shipment of wall panels to a U-Haul construction site in Knoxville, Tennessee. Defendant was hired by U-Haul to construct U-Haul's storage facility on a premises owned by U-Haul or a related company (not Defendant.) McKinney was scheduled to deliver those materials on April 14, 2021, but was delayed overnight when he

was required to make repairs to his trailer after a highway inspection. (Ex. 1, Kennedy Dep. 18:3-9). As such, McKinney arrived a day late, on the morning of April 15, 2021, at the U-Haul construction site towing his trailer with five bundles of metal wall panels and smaller wooden boxes with other materials, stacked as shown below:



(Ex. 1, Kennedy Dep. 56:3-58:25).

When McKinney arrived at the construction site, the site superintendent Curtis Kennedy instructed McKinney to move to the opposite end of the building, park his truck, and unstrap the load. (Ex. 1, Kennedy Dep. 53:20-22; 131:11). Either while McKinney was unstrapping the bundles, or after McKinney completely unstrapped the load, Kennedy unloaded the wooden boxes at the back of McKinney's trailer. (Ex. 1, Kennedy Dep. 60:22-62:6; 79:22-25). The bundles of wall panels were completely unstrapped before Kennedy began removing the bundles of wall panels. (Ex. 1, Kennedy Dep. 79:22-25).

### b. Vincent McKinney indicated to Curtis Kennedy that he could unload materials, then returned to the dangerous fall zone.

Before Kennedy approached the trailer to remove the bundles, McKinney moved away from his trailer to stand by the rear axle of his truck, out of the fall zone where the bundles could fall off the trailer. (Ex. 1, Kennedy Dep. 54:23-55:9). Before unloading the materials off the side

of McKinney's trailer, Kennedy approached the side of the trailer and stopped. *Id.* "I stopped where I could see him . . . and then made sure that he knew I was approaching, and then I moved forward to unload." (Ex. 1, Kennedy Dep. 55:2-55:9).

> A.    . . . I was talking directly to him because there's no one else around, and I was looking straight at him. So we had eye contact and verbal contact before I lost vision of him. And he's the one told me to move forward.
>
> Q.    What do you mean you lost vision of him?
>
> A.    Well, I mean those bundles are, approximately, 30-foot long, and when you move forward from where he was standing to where I was located, he eventually, you know, went out of my range of sight. So that's the reason I stopped before I got there so I could visic – you know, physically see him and him know I was approaching, and – and he told me yes.

(Ex. 1, Kennedy Dep. 79:10-21).

> A.    As I've stated before, I don't remember the exact – exact verbiage that was used that day, but I know for a fact I seen him when I was approaching the load, standing at the rear fender of his truck. He was rolling up straps, and we – we did communicate. We made eye contact, and I don't know what was said, but I could see him, you know, and hear him telling me and affirming that – to move forward, to go forward with –

(Ex. 1, Kennedy Dep. 53:2-9).

> A.    I stated from the beginning I do not remember the exact verbiage used, but between body language and communicating, I knew that – and that he had – he knew I was approaching.

(Ex. 1, Kennedy Dep. 84:7-10).

While McKinney was indicating to Kennedy that he could unload the trailer, a subcontractor named Robert Hutton was sitting nearby in his truck taking a break. (Ex. 2, Johnson Dep. 91:9-97:11, Ex. 3; Ex. 3, Hutton Witness Statement). Hutton heard the verbal exchange between McKinney and Kennedy. *Id.* Hutton later spoke with TOSHA investigators and provided a written Witness Statement to TOSHA. *Id.*

> I was sitting in my truck taking a break when they were unloading the trailer. I was looking at my phone and had the door open. I know they had already unloaded a identical material because I saw it stacked near the area. I heard someone say "Curtis your clear, Go." I heard the lift rev a little and then I heard a crash. . . .

Everyone was clear, Curtis had a good visual of the work area. I didn't see anything that appeared to be unsafe. They were communicating and the area was clear of people. I am not sure while he would tell him he was "clear" when he wasn't clear.

(Ex. 2, Johnson Dep. 94:2-21, Ex. 3; Ex. 3, Hutton Witness Statement).

Robert Hutton was not an employee of either Jenkins & Stiles or ClearShine Logistics – the company owned by Plaintiff and McKinney. (Ex. 2, Johnson Dep. 186:1-15). "He was an employee of Chattanooga Fire and just happened to be on-site with those few individuals that were working to install the sprinklers." (*Id.* at 186:11-14). TOSHA investigator Michael Johnson wrote down Hutton's statement while it was being given, and Johnson watched Hutton sign the statement. (Ex. 2, Johnson Dep. 91:9-97:11, Ex. 3; Ex. 3, Hutton Witness Statement). Mr. Hutton passed away on August 3, 2022, before his deposition could be taken.

Interestingly, Plaintiff does not mention the communications between McKinney and Kennedy, whether from Kennedy's deposition or from Hutton's statement. Plaintiff completely ignores the fact that there was a verbal communication between McKinney and Kennedy while they were making eye contact, with McKinney standing at the rear axle of his truck out of the danger zone, and Kennedy at a stop on the forklift. Plaintiff ignores the statement of a disinterested witness who heard the interaction between McKinney and Kennedy. Nonetheless, Plaintiff is asking the Court to bar all evidence that would support Defendant's comparative fault defense that Vincent McKinney contributed to the accident. (Dkt. No. 139, Motion for Sanctions, p. 24).

After McKinney signaled to Kennedy that it was safe to unload the bundles, McKinney did not move until he was out of Kennedy's sight:

Q.      . . . where was he the last time you say him before you approached that load?

A.      Standing right there at the back axle at the – you know, next to the fender of his truck.

Q.      Did he move at all from him giving you the signal, whatever it was, to you last seeing him?

. . .

> A.     He was standing still when we communicated.
>
> Q.     And did he move at all between when you communicated and the last time you saw him?
>
> A.     Not that I observed.
>
> Q.     Okay. Did you have any reason to think that he was going to move?
>
> A.     No. I assumed he would stay out of the way.

(Ex. 1, Kennedy Dep. 178:22-179:15). It was only after McKinney could no longer see Kennedy operating the forklift that McKinney moved away from the axle of the truck and walked into the fall zone around the trailer.

In the TOSHA investigation, Johnson concluded, "Mr. McKinney proceeded to a hazardous area after identifying that he was 'clear' to lift operator." (Ex. 2, Johnson Dep. 58:17-62:1, Ex. 3; Ex. 3, Hutton Witness Statement). According to Johnson, that was a dangerous thing for someone to do in that situation. "Because you're in – you're in an area in which material is unstable. It's being maneuvered, moved, loaded, and you're exposing yourself to the hazard. That's the whole purpose of the verbal communication from an operator to anybody in that area, to ask and make sure they're clear, to ensure that they're not in the hazardous area." (Ex. 2, Johnson Dep. 60:4-10).

> Q.     Is it unsafe, such as in a situation like this, if someone gives an "all clear" to a forklift operator and then moves into an unsafe area after they lose sight of the forklift operator? Is that unsafe?
>
> A.     Absolutely.

(Ex. 2, Johnson Dep. 183:14-19).

Once again, Plaintiff does not mention the fact that McKinney moved into the fall zone *after* giving the "all clear" to McKinney. Plaintiff ignores the dangerous action taken by McKinney. Nonetheless, Plaintiff would like the Court to bar all evidence of McKinney's comparative fault.

Only after receiving the "all clear" from McKinney, Kennedy approached the passenger side of the trailer to remove those bundles. Kennedy was under the impression that McKinney was still standing at the rear axle of the truck on the driver's side, because that is where McKinney was standing when he gave Kennedy the "all clear" signal. (Ex. 1, Kennedy Dep. 178:22-179:15).

Kennedy approached the bundles, inserted the forklift forks under the bundles, and began lifting: "I was looking at the load. I was looking where I was lifting. And, I mean, the equipment, as soon as you start moving, like I said, I didn't life it six inches, and I could tell the trailer was coming up. And by that time, I mean it was too late. The bundles were already falling." (Ex. 1, Kennedy Dep. 65:2-7). The two bundles on the driver side fell off the driver's side of the trailer, striking McKinney. (Ex. 1, Kennedy Dep. 122:7-124:23).

### c. First responders investigated and released the scene.

Kennedy estimated that the fire department arrived in approximately 5-8 minutes. (Ex. 1, Kennedy Dep. 163:1-7). First responders asked Kennedy to use the forklift to lift the bundle off of McKinney. (Ex. 1, Kennedy Dep. 154:14-156:13). Kennedy moved the three bundles he had already lifted out of the accident area, then returned to move the bundle off of McKinney. *Id.*

After the fire department, sheriff's department, and other first responders completed their response and investigation, the scene was released. (Ex. 4, Sullins Dep. 50:13-51:5, 65:19-67:18). Defendants expected more deliveries to the site either later that day or the next day, and the road needed to be cleared to make room. (Ex. 5, Humbard Dep. 33:12-24). Kennedy also testified that the truck and trailer was moved, "to secure it, for one thing, make sure all his stuff was in it and locked up . . . ." (Ex. 1, Kennedy Dep. 166:13-14). Steve Humbard, another certified forklift operator employed by Defendant, was asked to come from another site to assist and "clean up the

driveway." (Ex. 5, Humbard Dep. 15:2-9). The building materials were moved out of the way, and McKinney's truck and trailer were organized and parked where they appear in the TOSHA photos.

Photos from before and after Humbard cleaned up the driveway show that he simply stacked the bundles nearby in the same order that he picked them up, in the same position where they lay on the ground after the accident. The photos below, provided by Plaintiff, show the positions of the two bundles in relation to McKinney's trailer, with the bundle showing dirty forklift marks closer to the trailer, and the bundle that struck McKinney was farther from the trailer:





The photos below from the TOSHA file show that Humbard picked up the bundle that struck McKinney and put it on the ground next to the bundles Kennedy had already moved to the side during the initial response. Humbard then placed the bundle with dirt marks on top of that bundle. They were placed upside-down, exactly how Humbard picked them up off the ground.



Site superintendent Curtis Kennedy, company president Bart Jenkins, and project manager Josh Sullins all testified that Defendant was never asked by first responders or investigators to preserve the site or any materials:

> Q.    . . . TOSHA never asked you to preserve it?
>
> A.    TOSHA never asked, no.
>
> Q.    The sheriff never asked you?
>
> A.    No, they said – they told us we could clear the site.
>
> Q.    The fire – the sheriff's department said you could clear the site?
>
> A.    Yes.
>
> Q.    Their investigation was completed?
>
> A.    Yes.

(Ex. 1, Kennedy Dep. 177:2-11).

Q.      . . . Did any of the first responders onsite when you were there ask you or anyone at Jenkins & Stiles to leave any materials where they were or to leave the site untouched?

A.      No.

. . .

Q.      Are you aware of anyone from TOSHA or any of the first responders telling you or anyone at Jenkins & Stiles to leave the scene untouched?

A.      No. No. They didn't say that.

(Ex. 6, Jenkins Dep. 80:25-81:11).

Q.      Did anyone tell Jenkins & Stiles to set those panels aside?

A.      No.

Q.      As far as you know, you all just did that of your own accord?

A.      Yes, trying to preserve it as is – I mean, you just set it aside, keep it separate and –

Q.      Did the sheriff tell you to hold onto anything?

A.      No.

Q.      Did TOSHA tell you to hold onto anything?

A.      No.

Q.      Did Ms. McKinney's attorneys tell you to hold onto anything, as far as you know?

A.      As far as I know, no.

(Ex. 4, Sullins Dep. 103:14-104:2).

**d.  Defendant did not interfere with TOSHA's investigation.**

Later on the same day as the accident, TOSHA investigators came to the scene. Johnson testified that he has no reason to believe that anyone who provided him information as part of his investigation was being untruthful. (Ex. 2, Johnson Dep. 51:12-52:20).

Q.      Do you have any reason to believe that Mr. Kennedy was being untruthful at the time you were speaking to him?

. . .

A.      No.

Q.      Do you think he was hiding anything from you?

A.      I think he was emotionally distraught, but as far as hiding anything, no.

Q.     Do you think his emotional condition had any effect on the accuracy of the information he was giving?

A.     No . . . .

. . .

Q.     Do you think that anybody – any person had told Mr. Kennedy what to say to you or had in any way coached him or influenced his statement?

. . .

A.     No.

(Ex. 2, Johnson Dep. 66:5-23).

Defendant allowed TOSHA to perform their investigation without interference. ". . . I did not direct TOSHA on how to complete their investigation . . I didn't direct TOSHA's investigation in any way." (Ex. 4, Sullins Dep. 75:8-15). The TOSHA investigators inspected the bundles. Defendant's employee Steve Humbard was at the scene during the TOSHA investigation, and he saw the TOSHA inspect the bundles twice during their time on site. (Ex. 5, Humbard Dep. 60:12-25). As part of its investigation, Johnson reviewed the Sheriff's file, including the photographs taken at the scene, and he "ruled out" the dirty forklift marks on the bundle:

Q.     Okay. I want to hand you another photograph. You see the bottom of one of the bundles that's depicted in this photograph I just handed you?

A.     The mud. Yeah.

Q.     Okay. What is that?

A.     It appears to be forks, but the reason that we ruled this out is they moved the bundles after the event, so those marks could have been present from the cleanup, from the EMS crew that moved one off of Mr. McKinney.

Q.     Okay.

A.     I don't disagree that this is – appears to be, you know, marks from the fork of the forklift, but whether or not it occurred during that time, in my opinion, I would lean to say no because it's not poking it. It's mud. And my guess is, based off the location that these were, that mud contributed from this area over here because this entire area was gravel.

(Ex. 2, Johnson Dep. 117:18-118:11). Johnson admitted frustration with his investigation:

A.     . . . I mean, it frustrates me, but what am I going to do?

Q.     Okay.

A.     It frustrates me more that I didn't request that they move the bundles.

Q.     It frustrates you more that what?

A.     I didn't request that they move them so I could look at them closer.

. . .

A.     . . . I'll just be honest. It frustrates me personally because I hold myself to a higher standard, and it appears that I failed to look at something I should have.

(Ex. 2, Johnson Dep. 131:6-132:3).   Johnson clearly testified that no personnel of the Defendant interfered with his investigation. In fact, he testified that he failed in his own investigation. *Id.* That being said, Plaintiff used cherry-picked testimony by Johnson that was elicited over the objection of Defendant's counsel ("I feel like I've been hoodooed . . .") to form her imagined conspiracy that Defendant, its employees, its counsel, and its expert falsified, destroyed, and concealed evidence.

### e.  Plaintiff's family friend was on site within days to remove the truck and trailer.

Within days of the accident on Thursday, April 15, 2021, (before Defendant's counsel and expert visited the site on Monday, April 19, 2021,) Plaintiff's family friend Jermaine Small came to the site to pick up McKinney's truck and trailer. (Ex. 7, Perry Dep. 273:12-16). At that time the materials had not been moved since TOSHA's investigation, and were in clear view of Plaintiff's family friend while he was on site. Plaintiff then did nothing to preserve the truck and trailer picked up by Jermaine Small, other than to leave it parked outside until it was finally inspected by the parties and their experts on October 19, 2022. (Ex. 7, Perry Dep. 276:11-277:10).

### f.  Plaintiff did not provide any information to TOSHA.

TOSHA requested materials from Plaintiff and her company ClearShine Logistics (McKinney's employer) multiple times, starting on April 16, 2021, the day after the accident. (Ex. 7, Perry Dep. 268:4-270:15). "A request was made to the widow for documentation related to its inspection. No material was ever provided." (Ex. 2, Johnson Dep. 44:16-18). Based on his

investigation, Johnson concluded that ClearShine Logistics did not maintain a culture of safety. (Ex. 2, Johnson Dep. 89:13-90:11). "It just does not appear, based off my knowledge and what was requested and what was identified on site, that there was any reason to believe that safety was the core component of that company . . . ." *Id.* In contrast, Defendant provided everything to TOSHA that was requested. (Ex. 2, Johnson Dep. 67:22-68:10). Johnson determined that Defendant does have a culture of safety. (Ex. 2, Johnson Dep. 86:16-87:14).

### g. Defendant's counsel and expert conducted a site visit.

Plaintiff's counsel expresses shock that Defendant's counsel was present when the Defendant's expert visited the construction site on April 19, 2021, and that counsel took photographs and videos at the site. There is nothing unusual about an attorney being present for a site visit, or even taking photographs or videos. Indeed, it is not uncommon for plaintiffs' attorneys to advertise their willingness to come to the scene of an accident or even to visit a potential client in the hospital afterward. Furthermore, information obtained by counsel at the site inspection is protected by attorney client privilege or work product doctrine, so Plaintiff's outrage that photographs and videos taken by counsel were not produced are misplaced.

### h. Plaintiff's counsel sent a preservation letter that did not mention these materials.

On May 3, 2021, Plaintiff's attorney sent a letter to Defendant very specifically stating information that Plaintiff requested to be preserved: audio and video surveillance footage, internal written reports, recorded statements, maintenance/repair/inspection reports for the forklift, photographs, witness information, etc. (Ex. 8, Letter dated May 3, 2021). Plaintiff's counsel also requested the opportunity to inspect the forklift and the site where the accident occurred. *Id.* Plaintiff's preservation letter did not mention the materials that Plaintiff now argues is vital relevant evidence.

On May 26, 2021, at the request of Defendant, Defendant's counsel wrote to Plaintiff's counsel to indicate that Defendant did not own either the premises where the accident occurred or the forklift that was involved in the accident. (Ex. 9, Letter dated May 26, 2021). "We are unable to preserve the premises, the forklift, and other evidence that we and/or Jenkins & Stiles do not own, possess, or control." *Id.* Defendant did not own the premises, the building under construction, or the forklift used by Kennedy. Even if Defendant had notice that the bundles and plastic wrap were relevant, it probably would not have had the power to preserve the materials that were needed to construct U-Haul's building under Defendant's contract with U-Haul. Because U-Haul was the owner of the premises and the building (which Plaintiff was aware of,) Plaintiff should have contacted U-Haul to do any inspections she needed. There is no indication that Plaintiff did that.

Defendant's counsel also specifically requested to inspect Plaintiff's truck and trailer, and requested the preservation of other information. *Id.* Plaintiff's counsel refused to permit an inspection of her truck and trailer, stating, "As no lawsuit has commenced, we have no obligation to allow you to inspect the truck and trailer . . . ." (Ex. 10, Letter dated July 2, 2021). Plaintiff's counsel did not mention the wall panels, bundles, or plastic wrap in either of the pre-suit letters. In fact, the first time Plaintiff asked for the wall panels, bundles, or plastic wrap until March 23, 2023, in her Second Set of Requests for Production, nearly two years after the accident.

### i. Defendant preserved the materials for a reasonable time before using them in the normal course of business.

The materials that fell off of McKinney's trailer were set aside from the other similar materials. (Ex. 4, Sullins Dep. 103:14-104:2; Ex. 1, Kennedy Dep. 44:9-14). The materials were going to be used within the next two to three weeks after the accident to construct U-Haul's building. (Ex. 1, Kennedy Dep. 44:11-14). Only after the wall panels were installed by a subcontractor was the plastic wrap disposed of. (Ex. 1, Kennedy Dep. 43:19-44:18). According to

Kennedy, "It's not customary to save it, so I'm sure it went in a dumpster." (Ex. 1, Kennedy Dep. 44:1-2). Defendant's normal custom was to wait for the materials to be installed and then dispose of the packaging (or this would have been done by a subcontractor.) It cannot be said that Defendant intentionally destroyed evidence if they held onto the materials for two to three weeks, and then disposed of the packaging in the normal course of business.

**j. Plaintiff obtained detailed photographs, videos, and first responder reports.**

On March 8, 2022, Plaintiff served her initial disclosures. Included were the fire department report, Knox County Sheriff's Office report, a 32-minute body camera video, and 100 photographs from the Sheriff's investigation. These included detailed photos of the scene of the accident, the bundles that fell, and the dirty forklift marks on the bottom of one bundle. Therefore, these items were in Plaintiff's possession no later than March 8, 2022, and Plaintiff still had not asked for the bundles, wall panels, or plastic wrap.

## II.     LAW AND ARGUMENT

**a. Plaintiff is improperly attempting to use a spoliation argument about the building materials to obtain dismissal of Defendant's comparative fault defense about the interaction between McKinney and Kennedy.**

In its Answer, Defendant asserted comparative fault defenses specifically asserting that the accident was caused "in whole or in part by the negligence of Vincent McKinney. Jenkins & Stiles would allege that Vincent McKinney signaled to Curtis Kennedy that the area around the trailer was clear, then moved back into the area of danger without notifying Curtis Kennedy." Dkt. No. 133, Second Amended Answer, ¶¶ 2, 3, 4.

Plaintiff's Motion for Sanctions focuses on the physical evidence (the truck, trailer, cargo straps, building materials, and plastic wrap). Based on that supposed spoliation, Plaintiff seeks the sanctions barring Plaintiff from attempting to testify, argue, or presenting evidence of McKinney's own comparative fault. Essentially, Plaintiff is asking that Defendant's entire comparative fault

defense against McKinney be barred. This is directly contrary to the evidence in the case, and the requested sanction bears no relation to the alleged spoliation.

**b. Both Vincent McKinney and Curtis Kennedy bear responsibility for the accident.**

Plaintiff asserts in her Motion for Sanctions that Defendant "deny any negligence and place 100% of the blame on [McKinney] (and/or other) for causing his own death for being in the danger zone . . . ," citing Defendant's Second Amended Answer. (Dkt. No. 139, Motion for Sanctions, p. 7). This is simply untrue, misstates the affirmative defense asserted by Defendant, and ignores the opinions put forth by Defendant's expert. In her Motion for Sanctions, Plaintiff argues that Defendant "almost exclusively relies on [the building material bundles and the plastic packaging] as the basis of their opinions that Jenkins & Stiles and the forklift did not cause the cargo to fall onto Vincent McKinney . . . ." (Dkt. No. 139, Motion for Sanctions, p. 2). Again, this is untrue, and ignores the pleadings and facts in this matter.

Defendant asserts that ". . . Plaintiff's damages were caused in whole <u>or in part</u> by the negligence of Vincent McKinney. Jenkins & Stiles would allege that Vincent McKinney signaled to Curtis Kennedy that the area around the trailer was clear, then moved back into the area of danger without notifying Curtis Kennedy." (Dkt. No. 133, Second Amended Answer, ¶ 5 (emphasis added). Defendant relies on the evidence put forth by Kennedy and independent witness Hutton to support that affirmative defense, as well as the findings of the TOSHA investigator. The building materials and plastic wrap have nothing to do with the interaction where McKinney told Kennedy he was "all clear" and could unload the bundles.

Furthermore, Defendant's expert Charles Eroh made it clear that he believes both McKinney and Kennedy bear responsibility for the accident:

Q. And in your mind, you have resolved the answers to all of the questions that need to be determined for you to give an opinion and conclusion that Mr. McKinney is at fault for this; is that right?

A. Mr. McKinney and Mr. Kennedy both share responsibilities, is my opinion.

Q. Okay. You are saying that Mr. Kennedy is at fault; is that right?

A. Yes, Mr. Kennedy bore some responsibility as the forklift operator in this accident, yes.

A. The blame lies with Mr. McKinney and Mr. Kennedy.

. . .

Q. I'm focusing on Mr. McKinney right now, what you say is his fault. What is he at fault for?

A. He's at fault for leaving a safe position and walking in behind in an area that he – the fall zone, and being in the wrong place, putting himself in the position where he could be injured by the bundles falling.

(Ex. 11, Eroh Dep. 136:11-139:2).

Bizarrely, Plaintiff completely ignores the evidence of McKinney's comparative fault. He ignores the statements by Kennedy and Hutton regarding the communication between McKinney and Kennedy. Plaintiff argues that Defendant is relying on the building material bundles and plastic packaging to support its comparative fault defense that McKinney moved into the fall zone after giving the "all clear" signal to Kennedy. It is unclear how the physical evidence of the bundles would be related to McKinney's comparative fault. There is ample evidence through witnesses and investigators that McKinney bears some responsibility for the accident.

Plaintiff relies entirely on the physical evidence of marks on the plastic wrap to support a request that the Court preclude Defendant "from attempting to testify or argue that [McKinney] in any manner indicated . . . or verbalized it was clear to proceed, or that [McKinney] was 'fully aware' [Kennedy] was about to offload cargo . . . ," and "from claiming or attempting to present evidence that [McKinney] is at fault or caused his own death . . . ." (Dkt. No. 139, Motion for Sanctions, p. 5, 24). While the bundles and packaging may not support Defendant's comparative fault defense, the statements of Kennedy and Hutton and the findings of investigators certainly do.

**c. The plastic wrap itself is not relevant evidence.**

Plaintiff argues that the plastic wrap is a record containing material evidence. However, it appears that the plastic wrap has no probative value to add to the case. Plaintiff argues that the building materials and plastic wrap around the building materials are "the most important piece of evidence . . . because they would establish whether the forks went too far underneath the load that was on the other side of the trailer closer to the Truck Driver and what the position of the forks was when the Jobsite Superintendent attempted to lift the cargo with the forklift . . . ." (Dkt. No. 139, Motion for Sanctions, p. 9). Based on Defendant's expert, this appears to be a moot point.

Defendant's expert Mr. Eroh clearly stated that both McKinney and Kennedy bear responsibility for the accident. Plaintiff conveniently ignores this testimony in her attempt to pursue her spoliation conspiracy theory. Although Kennedy testified that he did not over engage the forklift under the bundles on the trailer, Eroh disagreed:

> A.  So based on the science, I believe Mr. Kennedy was incorrect and he did contact those other two bundles.
>
> …
>
> Q.  If that is what he told the TOSHA officer, that he didn't over engage them, he's mistaken about that, correct?
>
> A.  Yes, I would say he's mistaken about that. Yes.

(Ex. 11, Eroh Dep. 55:20-56:9). As far as Kennedy's actions that contributed to the accident, Defendant's expert appears to support Plaintiff's argument. Eroh has opined that Kennedy bears some responsibility, specifically:

> A.  . . . I feel that Mr. Kennedy over engaged the forks to the extent that they pushed the two bundles on the far side towards the edge of the trailer. Then he withdrew it, put them in the correct position. And as he started to lift, the shift in the load caused the two far bundles to fall over.

(Ex. 11, Eroh Dep. 39:21-40:2).

A:    I'm in agreement that, yes, the actions – the only thing out there that could have moved the bundles into the position they were at where they could call would have been the forklift.

Q.    Okay. And that was under the control of Mr. Kennedy, right?

A.    That is correct, yes.

(Ex. 11, Eroh Dep. 47:1-9).

Additionally, Plaintiff's expert Robert Bullen opined at length about the dirty fork marks on the bundle. (Ex. 12, Robert Bullen Report, p. 26-30). Utilizing photographs of the bundles and the marks, Bullen opined that the marks on the bundle were consistent with the tips of the forklift forks. *Id.* at 30. Bullen expressed no need to physically inspect the wall panels, bundles, or plastic wrap. Based on Eroh's testimony, Plaintiff's expert witness report, and the arguments of Plaintiff herself, it appears that the parties are in agreement that Kennedy bears some responsibility for the accident. Therefore, the materials seem to have no probative value in this matter

It appears that Plaintiff is attempting to argue that the spoliation of this irrelevant information somehow justifies a sanction barring Defendant from making any argument on a completely unrelated affirmative defense —that McKinney himself bears some responsibility for the accident. "A spoliation sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *BancorpSouth Bank v. Herter*, 643 F.Supp.2d 1041, 1059-60 (W.D. Tenn. 2009) (internal citations omitted). There is no connection between the materials and Defendant's comparative fault argument, so barring Defendant from making the comparative fault argument is not congruent with the alleged spoliation. As such, the sanction would be completely unrelated to the alleged spoliation.

### d. Defendant did not have notice that the bundles or plastic wrap were relevant, but did preserve them for a reasonable time.

Even if the bundles and plastic wrap would now be considered relevant evidence, Defendant did not have notice of that until long after it would have been reasonable to preserve

them. The TOSHA investigator testified that he viewed photos showing the dirty forklift marks on the bundles and "ruled them out." (Ex. 2, Johnson Dep. 117:18-118:11). Therefore, TOSHA determined that the bundles and the plastic wrap were not relevant. Plaintiff's counsel did not mention the bundles in either of her pre-suit preservation letter, even though the letters were sent after Plaintiff's family friend was on site and after TOSHA had communicated with Plaintiff about the accident. Therefore, it appears the Plaintiff and her attorney did not feel that the bundles or plastic wrap were relevant. Additionally, Defendant's expert Mr. Eroh testified that it was not obvious to him at the time of the site visit on April 19, 2021, that Kennedy had over engaged the forks, because he "didn't have the measurements from the forklifts to see if they matched the two scuff marks. (Ex. 11, Eroh Dep. 61:19-62:5).

Plaintiff had access to the Sheriff's file, the fire department's file, the medical examiner's file, the TOSHA file, and other materials soon after this accident. Included in those files were videos, photos, and other information obtained by investigators at the scene of the accident minutes after it happened. Plaintiff did not request the materials until March 23, 2023, in her Second Set of Requests for Production. This was months after Plaintiff deposed Kennedy, Sullins, Jenkins, Humbard, and Redmond. Moreover, this was nearly two years after TOSHA, the medical examiner, the Sheriff, and the fire department completed their investigations. If Plaintiff did not determine until March 23, 2023, that the materials were relevant, she cannot reasonably argue that Defendant knew or should have known that the materials were relevant shortly after the accident.

> . . . the party seeking sanctions for spoliation must show: (1) that the party having control over the evidence had an obligation to preserve the evidence at the time it was destroyed; (2) that the evidence was destroyed "with a culpable state of mind;" and (3) "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (internal quotation marks omitted).

*Trimboli v. Maxim Crane Works, L.P.*, 2020 WL 1031871, at *13 (M.D. Tenn. 2020). Furthermore, failure to establish even one of the three conditions necessitates the denial of a motion for spoliation sanctions. "The test prescribed in *Beaven* is conjunctive; thus, so long as the district court did not err in determining that (the moving party) had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset." *Adkins v. Wolever*, 692 F.3d 499, 554 (6th Cir. 2012).

As discussed above, Defendant held the materials for two to three weeks after the accident. By that time, Plaintiff and her attorney had already communicated with TOSHA and Plaintiff's attorney had already sent her preservation letter to Defendant. Moreover, no investigator had asked Defendant to preserve any information before the building materials were installed on U-Haul's building as scheduled, and the packaging was disposed of without any intention of destroying evidence, but solely in the normal course of business like the packaging on the other wall panels installed on the building, most likely by a contractor and not even by the Defendant.

> The duty to preserve arises only when a party becomes "reasonably aware of the possibility of litigation." *See Goetz,* 531 F.3d at 458 (citing *Zubulake v. UBS Warburg, LLC,* 220 F.R.D. 212, 217 (S.D.N.Y.2003)) ("The duty to preserve attach[es] at the time that litigation was reasonably anticipated.").

*DeBakker v. Hanger Prosthetics & Orthotics E., Inc.*, 2009 WL 5031319, *4 (E.D. Tenn. 2009). Plaintiff asserts that conducting a site visit with an attorney and expert must mean that Defendant was "on notice of these records were relevant to future litigation . . . ." (Dkt. No. 139, Motion for Sanctions, p. 3). Merely conducting a site visit with an attorney and expert does not indicate that litigation could be reasonably anticipated or that certain documents, things, or other information was relevant. Early indications (not least of which were the findings of the TOSHA investigator) showed that the accident was caused by McKinney himself. As such, it was not unreasonable for Defendant to assume that no litigation could be anticipated.

**e. Plaintiff is improperly attempting to use a spoliation argument to enflame the jury, prejudice Defendant, and lift the non-economic damages caps.**

Plaintiff requested that the Court "direct that it is established for the purposes of the action that Jenkins & Stiles intentionally destroyed records containing material evidence for the purpose of evading liability[.] (Dkt. No. 139, Motion for Sanctions, p. 24). Plaintiff also requested that the Court order that Defendant "should be precluded from disputing, or attempting to dispute, that they intentionally destroyed the record of material evidence . . . ." (Dkt. No. 139, Motion for Sanctions, p. 24). In doing so, Plaintiff is essentially asking the Court to circumvent Plaintiff's burden of proof in order to lift the cap on non-economic damages under Tenn. Code Ann. § 29-39-102.

Among the relief requested by Plaintiff in her Complaint was "Declaration and any other available relief that all statutory or other limitations on damages does not apply and/or is removed for the conduct at issue under one or more of enumerated exceptions or otherwise under Tenn. Code Ann. § 29-39-102(c), (d), and (h)(1-4)." (Dkt. No. 105, Plaintiff's Consolidated Complaint, p. 14). In Tennessee, an award for noneconomic damages shall not exceed $750,000.00, with the exception of certain specific instances. Tenn. Code Ann. § 29-39-102. The protections under Tenn. Code Ann. § 29-39-102 have been upheld by the Tennessee Supreme Court. *See McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686 (Tenn. 2020) (holding that the statutory cap on noneconomic damages does not violate the right to trial by jury, separation of powers, or equal protection). "As an initial matter, we recognize that it is within our General Assembly's authority to legislatively alter the common law." *McClay*, 596 S.W.3d at 690 (citing *Mills v. Wong*, 155 S.W.3d 916, 923 (Tenn. 2005) ("The Tennessee General Assembly itself has the power to weigh and to balance competing public and private interests in order to place reasonable limitations on rights of action in tort which it also has the power to create or to abolish.").

Plaintiff's requested sanction implicates the exception that lifts the cap "[i]f the defendant intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue . . . ." Tenn. Code Ann. § 29-39-102(h)(2). However, there is no evidence that Defendant intentionally falsified, destroyed, or concealed records. There is no evidence that Defendant disposed of the materials "with the purpose of wrongfully evading liability". There is no evidence whatsoever to support an argument that the materials were "destroyed with culpable state of mind." *See Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

In contrast, the record shows that Defendant maintained the materials for a reasonable amount of time before using the panels and disposing of the packaging in the normal course of business. There was no reason for Defendant to suspect that the building materials were relevant evidence justifying a delay of U-Haul's building project potentially as late as March 23, 2023, two years later, when Plaintiff finally requested that Defendant produce the materials in discovery. Also, preserving the building materials was not necessary, as both experts will testify what the marks on the bundles mean in reference to liability, and Plaintiff had access to the materials through a friend before Defendant's counsel and expert visited the site, and/or could have asked for the materials to be preserved when they sent their preservation letters, which she did not do.

Therefore, Plaintiff is attempting to use one sided and self-serving arguments to obtain sanctions that would all Plaintiff to circumvent her burden of proving that the non-economic damages caps should be lifted. If the Court directs that Defendant acted intentionally and bars any argument to the contrary, Defendant would be severely prejudiced. The jury would be forced to focus entirely on the conspiracy imagined and created by Plaintiff, and not on the merits of the case. As discussed above, Defendant has a meritorious comparative fault defense based on

evidence obtained from the TOSHA investigator, including an eyewitnesses whom Plaintiff had the opportunity to interview and obtain information from before he died, but chose not to do so.

**f. If Defendant is not permitted to argue that it did not intentionally destroy evidence, Plaintiff should not be permitted to argue that Defendant <u>did</u> destroy evidence.**

The evidence Plaintiff asserts was spoiled is not probative of a claim or defense at issue in this matter. Defendant's expert has testified that Kennedy bears responsibility in his operation of the forklift. The parties' experts reached the same conclusion that Kennedy contributed to the accident (for some reason, Plaintiff and her expert completely ignore the evidence of McKinney's own responsibility.) Therefore, whether Plaintiff's expert was able to closely inspect the plastic wrapping rather than utilizing the dozens of photographs of the scene and testimony to date, would not assist the parties in proving a claim or defense related to the operation of the forklift. As such, any argument regarding Defendant's actions as to the materials at issue would serve no purpose but to distract the jury and potentially enflame their emotions against Defendant on issues that serve no purpose. For this reason, neither party should be permitted to make arguments about destroyed materials. Besides being distracting, it deals with evidence that is not relevant to the issues and complicates a case for no reason. Moreover, it opens the door on other issues like Plaintiff's refusal to allow Defendant the opportunity to look at the truck and trailer immediately and making them wait over a year, and that the truck and trailer were left outside in the elements instead of preserved and kept in the same condition as they were at the time of the accident.

### III. <u>CONCLUSION</u>

The evidence Plaintiff claims was destroyed by Defendant is not relevant to the claims and defenses in this matter, and is solely being used as a backdoor attempt to keep the jury from hearing evidence of McKinney's comparative fault, to lift the cap on non-economic damages, and to distract and enflame the jury such that jurors would ignore the actual merits of the case. Plaintiff's

expert has opined that the marks on the bundles support Kennedy's fault, and Defendant's expert has opined that the marks show Kennedy bears some responsibility along with McKinney's actions. As such, even if the evidence was preserved, it would not have resulted in any changes on liability. Defendant's comparative fault arguments have nothing to do with the materials. Moreover, the argument that the materials were intentionally destroyed is absolutely not supported by the evidence. The fact is that Plaintiff's friend was onsite before Defendant's counsel and their expert, and Plaintiff's attorney had the opportunity to request materials were preserved, but never did so. As such, to argue Defendant should have somehow known to preserve materials that were not made an issue by Plaintiff until two years after the accident is unreasonable. To state it was intentional, when Defendant's own expert used the materials to state Kennedy has some responsibility for the accident, shows Plaintiff is using spoilation arguments not for what they are intended, but to try to persuade the court to circumvent specific statutory law for their own purposes; namely to allow them to obtain money in excess of what the legislature has specifically set forth to protect. *See McClay*, *supra*. As such, Plaintiff's Motion should be denied in its entirety.

Respectfully submitted this 22nd day of June, 2023.

**COPELAND, STAIR, VALZ & LOVELL, LLP**

*/s/ G. Graham Thompson*
ANGELA CIRINA KOPET, BPR 017921
G. GRAHAM THOMPSON, BPR 034467
735 Broad Street, Suite 1100
Chattanooga, TN 37402
Phone: 423-713-7075

## CERTIFICATE OF SERVICE

This is to certify that on the 22nd day of June, 2023, the foregoing pleading was filed electronically and that the notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

**COPELAND, STAIR, VALZ & LOVELL, LLP**

By:      */s/ G. Graham Thompson*