```
 1   A.      Yes.

 2   Q.      I guess?  Okay.

 3   A.      Yeah.  Anything forklift related in this

 4   entire file is going to be applied -- is in the

 5   realm of Jenkins & Stiles who's -- once again, this

 6   gentleman, the deceased gentleman's job was simply

 7   to drive, drop off and then drive wherever his next

 8   location was.  And there were no -- no training, no

 9   documents, no -- there wasn't anything provided or

10   uncovered that would identify anything in the realm

11   of forklifts or any other safety element or program.

12   Q.      That's with regard to the deceased and to

13   ClearShine?

14   A.      ClearShine.  Yes.

15   Q.      Okay.

16   A.      A request was made to the widow for

17   documentation related to its inspection.  No

18   material was ever provided.

19   Q.      If you're looking at page 13, there's a box

20   for -- on the top where it says, "Management

21   Participation," Number 4 is marked.  Can you read

22   Number 4 for me that's marked.

23   A.      "Management provides positive safety and

24   health leadership and is committed to providing

25   necessary resources for safety program, and
```

1  on-site outside of these two companies.

2  Ms. Redmond, which is Jenkins & Stiles' safety and

3  health representative, and I don't -- as far as

4  measurements and things of that nature would have

5  been provided and documented by me or Mr. Swift

6  on-site.

7  Q.    Is that typical of your investigations?  That

8  you would gather facts from different sources?

9  A.    Yes.  Employee interviews is one of the main

10  things of any inspection that OSHA and/or TOSHA

11  conducts.

12  Q.    Do you have any reason to believe that anyone

13  who provided you information as part of your

14  investigation was in any way being untruthful?

15          MR. WRIGHT:  Object to the form.

16  Q.    You can answer.

17  A.    I have no reason to believe that.  No.

18  Q.    Any reason to believe they were trying to

19  hide anything from you.

20  A.    No.

21  Q.    Do you think anyone you were speaking to had

22  any trouble -- or that you were getting information

23  from was having any trouble remembering the facts of

24  this accident at the time you spoke with them?

25          MR. WRIGHT:  Object to the form.

```
1    A.     No.  I think there could have been some
2    emotional play in certain instances due to the
3    severity of the situation, but based off the
4    information I had and correlated with the
5    information that we were able to document on-site,
6    nothing seemed off.
7    Q.     Okay.  Do you think that any of the people
8    you spoke with -- do you think that all of the
9    people you spoke with about this incident, either in
10   person or on the phone or communicated with via
11   email or any other sort of writing -- that they were
12   all being accurate and truthful?
13          MR. WRIGHT:  Object to the form.
14   A.     Accurate as they could be and truthful as to
15   what they knew as the truth.  Yes.
16          One thing I've learned doing that job and
17   multiple fatalities is people's mindsets isn't
18   necessarily as clear as it would be if they weren't
19   dealing with such a traumatic event that just
20   occurred.
21   Q.     If we look on page 22 -- if you could read to
22   me the section under Findings.  About five lines
23   down it says, "Through witness statements."  You see
24   where it begins right there?
25   A.     Uh-huh.
```

1    securement strap, in the vicinity of the securement

2    strap, that led us to believe -- also the condition

3    of the trailer -- it was not a new, you know,

4    trailer by any means.  And some of this is strictly

5    based off the lay of the land:  The parking lot and

6    the condition of the trailer.  It is believed that,

7    as I stated, that the weight transfer is what

8    initiated the bundle to fall.  You're removing

9    almost 3,500 pounds from a trailer.  That's going to

10   cause that trailer to rock, shift, move.  In this

11   case, once again, I said that trailer was -- it

12   could have used some maintenance.  So it is believed

13   that the trailer shifted.

14   Q.    I guess that leads me to the next page, on

15   page 23.  If you could read to me what your

16   conclusions were.

17   A.     "Through this investigation, the factors that

18   may have contributed to the death of the employee

19   include but are not limited to the following:

20   Unstrapping all material prior to the lift, leaving

21   it unstable; worn components of trailer led to

22   movement when weight was removed; Mr. McKinney

23   proceeded to a hazardous area after identifying he

24   was 'clear' to lift operator."

25   Q.    So in this finding, the third one is

1   "Mr. McKinney proceeded to a hazardous area after

2   identifying he was 'clear' to lift operator"?

3   A.      Yes.

4   Q.      That's one of your conclusions based on your

5   investigation?

6   A.      Based off witness statements.  Yes.

7   Q.      Okay.  And --

8   A.      And the location which he was found.

9   Q.      So if you could, I guess, go into a little

10  bit more detail about that conclusion for me.

11  A.      So as the witness statements identified

12  Mr. Kennedy, the forklift -- Mr. Kennedy, the

13  forklift operator was proceeding to do a lift.  In

14  that process he hollered to Mr. McKinney, asked if

15  he was clear.  Mr. McKinney identified that he was.

16  He was near the gooseneck of the trailer whenever

17  that communication was made, away from the area of

18  the material.  And within a few seconds after that,

19  the lift was initiated and ultimately the incident

20  occurred.  He was not in the area of the gooseneck

21  where they found him, and he was in an area that was

22  in the hazardous area because of the unstrapped

23  material.  He was not clear as he just stated to the

24  forklift operator that he was.

25  Q.      Is that the sort of thing -- is that a

1 dangerous thing for someone to do in that situation?

2 A.     Absolutely.

3 Q.     Why is that?

4 A.     Because you're in -- you're in an area in

5 which material is unstable.  It's being maneuvered,

6 moved, loaded, and you're exposing yourself to the

7 hazard.  That's the whole purpose of the verbal

8 communication from an operator to anybody in that

9 area, to ask and make sure they're clear, to ensure

10 that they're not in the hazardous area.

11 Q.     Do you believe that the operator in this

12 situation, Mr. McKinney, that he verbally

13 communicated with Mr. -- sorry.  Mr. Kennedy was the

14 operator of the forklift.  Do you believe that he

15 did communicate with the truck driver, Mr. McKinney?

16 A.     Yes, I do.

17         MR. WRIGHT:  Object to the form.

18 A.     There's a witness that was able to support

19 that statement that was not part of the lift, was

20 not part of just -- another worker in the building

21 doing another job.  He was able to provide

22 information that stated he did hear him holler

23 "clear" just before the incident occurred.

24 Q.     So based on your investigation, do you think

25 that the forklift operator, Mr. Kennedy, did

1  anything wrong?

2  A.    No.

3  Q.    Do you think that his employer, Jenkins &

4  Stiles, did anything wrong in this situation?

5  A.    No.

6  Q.    After investigation do you think that the

7  deceased man, Mr. McKinney, did anything wrong in

8  this situation?

9  A.    Yes.

10  Q.    And what is that?

11  A.    That is he failed to stay in the area that

12  was clear of the zone that he just identified to the

13  forklift.  In my opinion -- this can't be

14  confirmed -- but due to his location and the

15  condition of his straps, I believe that he was in a

16  rush, trying to get his straps rolled up on his

17  trailer so that as soon as that material was

18  unloaded, he could proceed to wherever he was moving

19  towards.  And that is why -- I believe his mentality

20  was that the forklift operator was on the eastern

21  side.  He was on the western side that's the hazard.

22  So therefore, he tried to, you know, just be a

23  diligent worker and get ahead for hisself and get

24  the straps wound up.  Unfortunately, that put him in

25  a danger zone in which he had just identified he was

www.EliteReportingServices.com

```
1    clear of.

2    Q.      It's our understanding that Mr. McKinney, the

3    truck driver, had been delayed overnight because of

4    an inspection by the DOT?

5    A.      That is correct.

6    Q.      Okay.  You are aware of that?

7    A.      Yes.

8    Q.      How did you find out about that?

9    A.      Jenkins & Stiles provided that information

10   through the opening conference and ultimately the

11   investigation as a whole.  You know, kind of getting

12   some of the base knowledge of what this gentleman

13   was doing there and what his job title was because

14   we were -- you know, obviously he was not there.  I

15   didn't know -- they identified he was there to

16   deliver the materials and that he was supposed to be

17   there the day prior.  Due to a failed DOT

18   inspection, his truck and ultimately the trailer as

19   well were flagged, and he was not allowed to leave

20   until -- I don't remember what the issue was, but he

21   corrected the problem and then ultimately did show

22   up a day late because of his issues.

23   Q.      And did you -- you got that information from

24   Jenkins & Stiles, or did you have any other source

25   of information on that?
```

```
 1   Q.     Again, try to wait till I'm done with my
 2   question before you answer it.  It helps out the
 3   court reporter, but also you never know if my
 4   question's going to take a turn toward the end.
 5        Do you have any reason to believe that
 6   Mr. Kennedy was being untruthful at the time you
 7   were speaking to him?
 8             MR. WRIGHT:  Object to the form.
 9   A.     No.
10   Q.     Do you think he was hiding anything from you?
11   A.     I think he was emotionally distraught, but as
12   far as hiding anything, no.
13   Q.     Do you think that his emotional condition had
14   any effect on the accuracy of the information he was
15   giving?
16   A.     No, because he feels like he killed someone.
17   The guilt would not allow him to be untruthful,
18   based on what I witnessed that day.
19   Q.     Do you think that anybody -- any person had
20   told Mr. Kennedy what to say to you or had in any
21   way coached him or influenced his statement?
22             MR. WRIGHT:  Object to the form.
23   A.     No.
24   Q.     If you look on pages 27 to 58 -- that's just
25   a couple dozen photographs.  I think at the top of
```

www.EliteReportingServices.com

```
 1   each page it's titled "Photo Mounting Sheet."

 2   A.      Yes.

 3   Q.      Is that correct?  It's 27 through 58?

 4   A.      Yes.  That's correct.

 5   Q.      Who took these photos?

 6   A.      Probably would have been both me and Joseph.

 7   Q.      And who compiled these into this report?

 8   A.      I ultimately compiled them into the report.

 9   If you look back at the index on page --

10   Q.      -- 66?

11   A.      -- 66.

12   Q.      I believe -- well, that's additional

13   information.  Sorry.

14   A.      Yeah.  Right here, page 4 -- or 6 -- if you

15   look at 5/18/2021, approximately one month -- a

16   little bit over a month -- Joseph Swift left

17   Tennessee OSHA, and I was left with this case file

18   to compile on my own.

19   Q.      I see.  So I understand, part of your --

20   well, I guess if you look ahead to page 66, like I

21   just talked about, we have this Index of Additional

22   Information.  So I understand, you did get

23   information from Jenkins & Stiles.  Is that correct?

24   A.      Yes.

25   Q.      What did they end up sending to you?
```

www.BoutreReportingServices.com

```
 1   A.     Documentation of their forklift training and

 2   other safety-related documents, some may be relevant

 3   and some not, but a lot of times when we make

 4   requests to companies during an investigation, they

 5   send pretty much all safety-related documents that

 6   they have that at least correspond with whatever

 7   situation we're dealing with.

 8   Q.     Did you get everything from them that you

 9   requested?

10   A.     Yes.  I've worked with Ms. Redmond on

11   multiple investigations.  She knows what TOSHA does

12   and how they operate and what they need and when

13   they need it, and she stays on top of it.

14   Q.     Is Ms. Redmond an employee of Jenkins &

15   Stiles?

16   A.     No.

17   Q.     Who does she work for?

18   A.     An insurance company.  I couldn't tell you

19   the name of them.

20   Q.     Okay.  I think I actually have it.  I think

21   she -- you mentioned she was one of the people who

22   reported it.

23   A.     Yeah.

24   Q.     Page 15 has her on the Site Contact.  Scott

25   Insurance Company.
```

```
 1   A.      No issues.  You can always do better.

 2   Q.      What do you mean by that?

 3   A.      I mean, it's kind of the mentality in the

 4   safety field.  You know, people think that you've

 5   done enough because you've provided people training,

 6   but there's always more you can do.  A lot of people

 7   do just what OSHA requires, what's in the

 8   regulations.  Well, what people don't -- a lot of

 9   people don't realize is OSHA regulations are the

10   bare minimum.  There's -- you can do a lot more to

11   keep individuals safe above OSHA regulations.

12   Q.      If someone is, for example, just doing --

13   following the OSHA regulations, would you say they

14   are doing -- taking the appropriate actions?

15   A.      Yes.

16   Q.      In your opinion, based on your review of all

17   the information related to this incident, do you

18   think Jenkins & Stiles maintained a culture of

19   safety?

20           MR. WRIGHT:  Object to the form.

21   A.      Yes.

22   Q.      When we say "culture of safety," is that a

23   term of art you use in your business?  Your

24   industry?

25   A.      Yes.
```

www.BulterReportingServices.com

85

1   Q.      What does that mean?

2   A.      That means that safety is embraced by not

3   only the safety coordinator, safety manager,

4   whatever the title may be, but by each and every

5   employee of the company from the top down.  It is a

6   way of life where safety is involved in every aspect

7   of what they do.  It's planned for.  You know, the

8   materials are provided to address it.  You know, the

9   equipment's provided to -- they're positive-minded

10  in relation to safety.  And not every place is like

11  that.

12          I've ran across Jenkins & Stiles multiple

13  times on multiple sites, and I've never identified

14  any issue with hazard within their arena.

15  Q.      So based on your investigation as a whole

16  into this matter, do you think that the action of

17  the truck driver -- the actions of the truck driver,

18  Mr. McKinney, were safe and appropriate?

19  A.      No.

20  Q.      What leads you to that conclusion?

21  A.      First and foremost, I think he was rushed and

22  he was stressed based off the events that led up to

23  that point, trying to get that delivery to where it

24  was needed.  I think the stress level -- while that

25  sounds like it's not that big a deal, but as we all

```
1   do remember in this case that they were having to

2   build it not in the typical order that they would

3   because of material.  But outside of that, I

4   don't -- I don't have any information.  And it

5   wasn't just the material that Mr. McKinney was

6   delivering.  It was other aspects of that building,

7   that construction site.

8   Q.     And that was pretty typical -- I mean, I

9   guess that's not atypical for construction at any

10  time but particularly during the pandemic?

11  A.     Everybody was dealing with it, yeah.  It was

12  across the board.

13  Q.     So based on your review of this incident and

14  communications with ClearShine Logistics, with

15  Mr. McKinney's widow, do you think that ClearShine

16  Logistics maintained a culture of safety?

17  A.     No.

18  Q.     What leads you to that conclusion?

19  A.     I just believe that due to the type of

20  business it was, that it's not -- in the industry as

21  a whole, not even just ClearShine, it's not typical

22  that that is a culture of safety.

23         Like I said, their hazards are minimal that

24  they're exposed to and pretty much, you know, some

25  basic training and the hi-viz vest, you know,
```

```
 1   vehicular traffic is going to be their biggest
 2   hazard.  It just doesn't appear, based off my
 3   knowledge and what was requested and what was
 4   identified on-site, that there was any reason to
 5   believe that safety was the core component of that
 6   company unless you count -- you know, I think -- I
 7   think the safety idea was more relevant, like I
 8   said, to roadway safety.  I think that could have
 9   been more prevalent, you know, as far as roadway
10   hazards, breakdowns, because that's what they
11   typically dealt with.
12          As in this situation, they're not forklift
13   operators.  They're not doing -- they drive to a
14   location.  They park.  They let someone unload the
15   trailer.  They go get another load, but the lack of
16   understanding of the hazards and material, loading
17   and unloading, I think showed the lack of a safety
18   culture and understanding that that was a hazard
19   they were exposed to possibly on a daily basis
20   depending on what their delivery schedule was.
21   Q.     In reaching your conclusions in this matter,
22   did you refer to any -- other than the documents
23   that we've talked about already that are contained
24   in the file, did you refer to any rules,
25   regulations, standards, guidelines, any other
```

www.BdureReporting.Services.com

```
 1   specific manuals as part of your -- reaching your
 2   conclusions?
 3   A.     No.
 4   Q.     The conclusions you've reached -- that you
 5   reached in your investigation, are they based on
 6   your education, training, experience and your job
 7   function at TOSHA as an area safety supervisor?
 8   A.     Yes.
 9   Q.     I want to talk about -- look on page 59 of
10   this file.  This is another witness statement.
11   A.     50 --
12   Q.     59.  This is, I believe, the witness
13   statement of Robert Hutton.  Is that correct?
14   A.     Yes.
15   Q.     Whose handwriting is on this paper?
16   A.     This would be mine.
17   Q.     I think actually on page -- yeah -- 61, it
18   says, "The above statement was written by Micheal
19   Johnson."  So you were the one who actually wrote
20   this witness statement?
21   A.     Yes.
22   Q.     Who conducted the interview of Mr. Hutton?
23   A.     Myself.
24   Q.     Was it just you or was Mr. Swift with you?
25   A.     Mr. Swift would have been with me.
```

www.BlueReporting Services.com

```
1   Q.     Okay.  Was this done in person?

2   A.     Yes.

3   Q.     And it's dated on page 59 -- at the top it's

4   dated 4/19/2021?

5   A.     Yeah.  It did occur -- I said, "Yes"

6   initially.  I'm trying to remember in this

7   particular case -- which it should.  It's been a

8   while since I've looked at these.  I'm trying to

9   recall if it was in person or over the phone.

10  Q.     Did you ever go back to the construction

11  site?

12  A.     We did return back to the site one time, yes.

13  And I'm thinking that's when it occurred.  Yeah, it

14  was -- it's starting to come back to me now.  We

15  went back to conduct a closing conference, which is

16  ultimately kind of how we tie up an investigation,

17  at least on-site, and let them know kind of what our

18  initial conclusions are as far as violations, maybe

19  gather any other information we need while we're

20  there and go over some other pertinent legal stuff

21  if we have to.

22         In this case we did arrange for this

23  gentleman to be there at that time so we could

24  conduct an interview with him prior to our closing

25  conference.
```

www.BDCourtReportingServices.com

1    Q.     So the closing conference is, I guess, for

2    that part of your investigation, maybe an on-site,

3    on-scene part of your investigation?  Is that what

4    you're saying?

5    A.     Well, it's -- closing conference is what sums

6    up what we've identified during the course of the

7    investigation.  So if we identified any hazards, any

8    violation, who they're connected to, so forth, we

9    would have went over all that information.  And as

10   you looked at -- let's see.  We did have a brief

11   closing conference initially -- whenever we leave

12   the site, just to let them know what we're looking

13   at, and depending -- like, in a situation like this,

14   a lot of time we have to await safety documentation,

15   records, things from the first responders, things of

16   that nature, so we can't get all our information.

17   We usually do a secondary closing that ultimately

18   identifies anything outside of the first closing

19   that we've come to a conclusion on.

20          In this case we scheduled this interview

21   right before we conducted our closing, which in this

22   particular case, the closing wasn't a typical

23   closing because there were no violations that were

24   being recommended.

25   Q.     So if you could read to me the statement that

1  you wrote here for Mr. Hutton.

2  A.     "I was sitting in my truck taking a break.

3  They were unloading the trailer.  I was looking at

4  my phone and had the door open.  I know they had

5  already unloaded identical material because I saw it

6  stacked near the area.  I heard someone say,

7  'Curtis, you clear?  Go.'  I heard the lift rev a

8  little and then I heard a crash.  I looked at the

9  area and moved to a better line of sight and saw him

10 under the material.  He was blue-looking, so I

11 called 911.  Everyone was clear.  Curtis had a good

12 visual of the work area."

13      I want to clarify.  This goes into questions

14 that were asked of him, not just him just speaking

15 that way.

16      "I called" -- "everyone was clear.  Curtis

17 had a good visual of the work area.  I didn't see

18 anything that appeared to be unsafe.  They were

19 communicating and the area was clear of people.  I'm

20 not sure why he would tell him he was clear when he

21 wasn't clear."

22 Q.     So you're not just, I guess, writing down

23 verbatim what he says as he's saying it?

24 A.     The initial part would have been, but there

25 should have been a break in there -- that's on me --

1    that identifies questions.  But at the end where I

2    say, "'So I called 911,'" that would have been his

3    original statement about what happened, and then

4    from that point on it would have been based off

5    questions that were asked of him.

6    Q.    Okay.  And then on page 61 in the middle

7    there, it says, "The above statement was written by

8    Micheal Johnson.  It has been read to me and is true

9    and correct."

10         Does that mean that you or Mr. Swift read his

11   statement out loud to him and he didn't actually

12   look at it himself to read it?

13   A.    Yes.  Every witness statement we do, we give

14   either the option they can read over it theirself or

15   we can read it back to them to ensure accuracy

16   before we sign and ultimately circle whichever one

17   was done.

18   Q.    Okay.  And whose signatures are these on page

19   61?

20   A.    That would have been -- "Witnessed by" would

21   have been mine and then Robert Hutton's signature

22   there.

23   Q.    So this second one, "Witnessed by," that's

24   your signature?

25   A.    Yes.

```
 1   Q.     So you watched him sign this document?

 2   A.     Yes.

 3   Q.     Does the witness statement accurately state

 4   what Mr. Hutton said to you and Mr. Swift?

 5   A.     Yes.

 6   Q.     So this witness statement was written while

 7   he was giving his statement to you and Mr. Swift and

 8   then signed immediately afterwards?

 9   A.     Everything was done right on-site --

10   Q.     Okay.

11   A.     -- at the same time.

12   Q.     Do you have any reason to believe that

13   Mr. Hutton was being untruthful in any way in what

14   he was saying?

15            MR. WRIGHT:  Object to the form.

16   A.     No.  He didn't work for any of the companies

17   involved in the situation.  I wouldn't see why he

18   would want to be or need to be.

19   Q.     Was he on-site on the 15th when you conducted

20   your initial inspection?

21   A.     No, not when we conducted the initial

22   inspection because just as many fatalities,

23   typically when one occurs on-site, most of the time

24   most individuals are sent home due to the nature of

25   the event that's occurred there.  It was identified
```

www.BlueLineReportingServices.com

```
 1    that he was a witness and ultimately his information

 2    was gathered, and that's why at a later time it was

 3    scheduled to speak with him.

 4    Q.     So do you think that anybody had, I guess,

 5    coached him on what to say to any investigator of

 6    any kind?

 7              MR. WRIGHT:  Object to the form.

 8    A.     Not to my knowledge.

 9    Q.     Did he give you any indication that he had

10    any trouble remembering the incident itself?

11    A.     No.

12    Q.     Do you think he left anything out of his

13    statement or was -- I guess, any details were

14    missing from his statement?

15    A.     Nothing past the point after the incident.  A

16    lot of times when we request information, we're

17    asking these witnesses in regards to a fatality,

18    they'll want to go into more detail as far as what

19    happened after first responders arrived.  And in

20    this particular case, as most of them, that's not

21    really relevant to our investigation unless some

22    piece of material was thrown away.  Or, you know,

23    there could be a situation where it could be, but in

24    this case there's no reason to believe that we

25    needed any information once first responders
```

www.BdigreeReporting&Services.com 90

```
 1   marks if you had access to --

 2   A.     The bottom or top one?

 3   Q.     The bottom part of it.

 4   A.     Yeah.  I mean, because it might possibly show

 5   forks that had penetrated -- in this case these were

 6   wrapped in a particular way.  So I mean, yeah, it

 7   could.

 8   Q.     So it could leave a mark.  Is that right?

 9   A.     It could.  Yeah.

10   Q.     And you weren't allowed to look at that

11   because, as we saw in Exhibit 4, those bundles were

12   stacked on top of each other.  Is that right?

13   A.     That is right.

14            MR. THOMPSON:  Object to form.

15   Q.     And that could change your conclusions you

16   come to, correct?

17   A.     Possibly.  Yes.

18   Q.     Okay.  I want to hand you another photograph.

19   You see the bottom of one of the bundles that's

20   depicted in this photograph I just handed you?

21   A.     The mud.  Yeah.

22   Q.     Okay.  What is that?

23   A.     It appears to be forks, but the reason that

24   we ruled this out is they moved the bundles after

25   the event, so those marks could have been present
```

1  from the cleanup, from the EMS crew that moved one
2  off of Mr. McKinney.
3  Q.     Okay.
4  A.     I don't disagree that that is -- appears to
5  be, you know, marks from the fork of the forklift,
6  but whether or not it occurred during that time, in
7  my opinion, I would lean to say no because it's not
8  poking it.  It's mud.  And my guess is, based off
9  the location that these were, that mud contributed
10 from this area over here because this entire area
11 was gravel.
12 Q.     Let me ask this:  Have you ever seen that
13 photograph before?
14 A.     I believe so.  It should have been in the
15 police report, but it's been a while.  I can't
16 say -- I can't recall a hundred percent.
17 Q.     I don't see it listed in your materials that
18 were reviewed in the inspection that you --
19 A.     It would not be in there.
20 Q.     Okay.  Because it said, "all materials
21 reviewed," and I don't see that photograph listed.
22 A.     These -- if this photo was reviewed, it would
23 have been in the police report, and when we input
24 the police report -- our version of the police
25 report, the photos are redacted from that.  The

www.BlumeReportingServices.com

```
 1    why I came to try to help people and not deal with
 2    this stuff.  I'll be honest because there is a
 3    reality that you can't trust everyone and people are
 4    doing things they shouldn't, but that goes across
 5    the board to anybody regardless of the company.  But
 6    yeah.  I mean, it frustrates me, but what am I going
 7    to do?
 8    Q.      Okay.
 9    A.      It frustrates me more that I didn't request
10    that they move the bundles.
11    Q.      It frustrates you more that what?
12    A.      I didn't request that they move them so I
13    could look at them closer.
14    Q.      Well, you relied on them to be honest and
15    truthful with you, didn't you?
16                MR. THOMPSON:  Object to the form.
17    A.      I wouldn't say that.  I relied -- I relied on
18    them and the information that was present at the
19    site to do my own investigation, but as far as --
20    you know, every investigation I've ever done, I
21    don't ever assume anyone's being truthful with me.
22    Q.      Okay.
23    A.      I'm a -- you're an OSHA compliance officer.
24    That's not something you really expect out of
25    anybody.  I'll just be honest.  It frustrates me
```

www.Bledsoe-ReportingServices.com

1   personally because I hold myself to a higher

2   standard, and it appears that I failed to look at

3   something I should have.

4   Q.      But in your defense, you would have had to

5   get them to lift that one bundle off of the other

6   one in order for you to be able to look at it,

7   right?

8                MR. THOMPSON:   Object to form.

9   A.      Yes.   You're correct.

10  Q.      Okay.

11  A.      Because if I recall correctly, this is the

12  bundle that had blood on it.

13  Q.      You're pointing to the bottom one in

14  Exhibit 9, correct?

15  A.      Yes.

16  Q.      Okay.   And that brings me to my next question

17  which was:   Have you had the benefit of seeing any

18  of the photographs to show how the forklift operator

19  attempted to lift up the bundle when Mr. McKinney

20  was under it?

21  A.      Like an example photo?   Like a re-creation?

22  Q.      I think there's some photos that show when

23  the fork was used to lift up this area where the

24  blood is to get it off of Mr. McKinney.   Because

25  obviously it was on him, right?

```
 1   when it comes to a construction site.  Is that
 2   correct?
 3   A.      Yes.
 4   Q.      I guess the safest thing would be just to
 5   never do any construction at all, right?
 6   A.      Yes.
 7   Q.      And that at any construction site and any
 8   different situation -- you may have at a
 9   construction site that it depends on all the
10   circumstances involved:  All the personnel on all
11   the equipment; all the weather conditions; many,
12   many different possible factors.  Is that right?
13   A.      That's correct.
14   Q.      Is it unsafe, such as in a situation like
15   this, if someone gives an "all clear" to a forklift
16   operator and then moves into an unsafe area after
17   they lose sight of the forklift operator?  Is that
18   unsafe?
19   A.      Absolutely.
20   Q.      Mr. Wright talked earlier about whether the
21   witness, Mr. Hutton, could be heard.  Is it possible
22   for people to holler loud enough on a construction
23   site that people some distance away could hear them?
24              MR. WRIGHT:  Object to the form.
25   A.      Absolutely.  Most of them are very loud
```

www.BluebirdReporting.Services.com

1    Q.     And in addition to Mr. Kennedy explaining the

2    interaction between him and Mr. McKinney, you also

3    have Mr. Hutton's statement about what he heard that

4    day, right?

5    A.     Yes.  That's correct.

6    Q.     And he is, as far as you know, an independent

7    witness with no connection to any of these parties

8    except he was a subcontractor on-site?

9    A.     That's correct.  He was not an employee of

10   Jenkins & Stiles.  He was not an employee of

11   ClearShine Logistics.  He was an employee of

12   Chattanooga Fire and just happened to be on-site

13   with those few individuals that were working to

14   install the sprinklers.  And this particular moment

15   the incident happened, he was taking a break.

16   Q.     Is there only -- is there only one -- in a

17   situation like this where you're trying to unload

18   materials from a trailer, is there only one safe way

19   to do that?

20   A.     I wouldn't say that.  Once again, it comes

21   greatly down to what type of material is being

22   unloaded; what type of forklift you're using; what

23   type of trailer; the ground, you know, if you're in

24   an area -- maybe you're on a busy street, downtown.

25   You've got sidewalks, pedestrians.  I mean, it's

Case 3:21-cv-00414-KAC-JEM  Document 44-1  Filed 05/23/23  Page 28 of 28  PageID #:
1352
www.EliteReportingServices.com
185