1  they'll probably have an arrival time on there.
2  Q.    I'm asking you.
3  A.    Oh.  Well, for me to be able to answer your
4  question specifically, I would reference their report.  I
5  mean, I don't know.  I think maybe -- I mean, it could
6  have been 2:00.  It wasn't immediate.
7  Q.    Right.
8  A.    They weren't there, like, immediately.  I didn't
9  know if they were -- I mean, I don't know that they were
10 going to show up or call us in three days --
11 Q.    Sure.
12 A.    -- and have a site -- I mean, I don't know.
13 Q.    So, when TOSHA got there, had the bundles that were
14 on the ground next to the trailer that had fallen, had
15 they been moved somewhere else to a different part of the
16 yard?
17 A.    I believe -- yeah.  I believe they had been
18 relocated at that point because I -- I think we had -- we
19 didn't know if they were coming or, you know -- we had --
20 we had been released.
21       I think I -- I had asked Sandy, "Hey, is there
22 anything else we need to do?  You know, I mean, what do we
23 need to do?"
24       You know, I -- everything had been released.
25 Everything had been photographed at that point.

```
 1  Everything had been documented.  We pretty much secured
 2  the scene at that point because it had been released, and,
 3  you know, I -- "Hey, what do we need to do?  Let's go
 4  ahead and secure everything and get everything in good
 5  working order."
 6          That's when we reached out to Steve Humbard, the
 7  other superintendent that moved -- that cert -- that's
 8  forklift certified, as well, to -- to move these bundles,
 9  you know.
10  Q.    So Steve Humbard is who Curtis Kennedy believed was
11  the other job superintendent who came from a different job
12  to help with this one; is that right?
13  A.    Yes.
14  Q.    Okay.  And he's the one that got in the forklift
15  and, apparently, moved these two bundles that had fallen
16  over towards the area where the other ones were; is that
17  right?
18  A.    Yes, to -- to stack them neatly and safely and, you
19  know, secure everything.  They're out in the middle of a
20  drive lane currently, so that's the, you know, kind of in
21  and out.  I mean, it's a parking lot drive area.
22  Everything had been doc -- yeah, like I said, and then --
23  go ahead.
24  Q.    All right.  And Curtis told us that he believes
25  that the -- the wrapping that was around these two bundles
```

Case 3:21-cv-00414-BRJM-JBM Document 141-4 Filed 06/22/16 Page 2 of 8 PageID #:
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1  looked at or anything like that, they could be done in
 2  such a way that --
 3  Q.     Was it someone from Jenkins & Stiles that decided
 4  to put that bundle on top of the other one that way that
 5  it's depicted in Exhibit 22 from Curtis Kennedy's
 6  deposition?
 7  A.     My -- my -- it was probably the forklift operator,
 8  that Steve, that once he picked -- we moved it over there.
 9  We decided to move it out of the way of the drive lane
10  next to the other bundles that had been -- that Curtis had
11  put there after once -- once the fire department had
12  requested that he come lift that one, he put the three
13  bundles over there stacked.  We moved them -- I say, "We,"
14  me and Steve Humbard had them move -- Steve moved them
15  over there, and when he did it, he -- you know, he just
16  stacked them.  I don't know if there was a conscious...
17  Q.     You're the one that told Steve to move it over
18  there, right?
19  A.     Yeah.  We -- we -- I moved -- I told him to move it
20  over there.  I asked Sandy, you know, "Hey, you know, when
21  do we need to do this," and she said the scene's been
22  released to us, so we can just go ahead and start securing
23  the site.
24         And so, I -- you know, "Hey, move it.  Move it over
25  next to the other bundle so we -- we keep them separate
```

Case 3:21-cv-00414-RGJ-CHL Document 144-3 Filed 06/22/615 Page 3 of 8 PageID #: 1253
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  from the rest," because there's other bundles on site.  I
2  don't want to get them mixed in, so I'll put them with the
3  same load.  And then, he picked that one.
4       I said, "Hey, let's make sure we get something
5  underneath it in case they need to be relocated or moved
6  at a later time."  The forks aren't digging into the
7  ground.  They're able to get underneath it, and that's
8  that wood you see underneath there.
9       And then, you know, when he picked the other one,
10 he -- we stacked them, I mean, because they have
11 dunnage -- or they have that dunnage in-between.  They're
12 upside down now, but...
13 Q.   Did you rely on what Sandy Redmond told you in
14 moving those over there and stacking them on each other
15 like that?
16 A.   "Rely?"  By "rely," she -- what do you mean,
17 "Rely?"
18 Q.   Well, because you kept saying, Well, I was asking
19 Sandy.  She said it had been released.
20 A.   Yeah, it had been released.  We had done everything
21 that we needed to do.  It had documented -- I mean, it had
22 been documented by the sheriff's department, the coroner,
23 and -- and everything like that.  They had released the
24 scene, so start securing the -- it's in the middle of a
25 drive lane on a project, I mean.

Case 3:21-cv-01114-BEN-JLB Document 141-4 Filed 06/22/615)5954-0073 Page 56 of 83 PageID #:
Elite-Brentwood Reporting Services
www.EliteReportingServices.com
1859

```
 1  Q.     So you're relying on the advice of Sandy Redmond in
 2  deciding --
 3  A.     To secure the scene, yes.
 4  Q.     -- yeah, to put that stuff over there, right?
 5              MR. THOMPSON:  Mr. Sullins, could you
 6  just make sure you wait until he's done --
 7              THE WITNESS:  Oh.
 8              MR. THOMPSON:  -- asking his questions?
 9              THE WITNESS:  Yes, sir.
10  BY MR. WRIGHT:
11  Q.     You relied on what Sandy Redmond told you in
12  deciding to put this stuff over there, as is shown in
13  Exhibit 22 to Curtis Kennedy's deposition, correct?
14  A.     To put that stuff over there, yeah.  I mean, I made
15  a decision, Hey, let's stack it next to the other bundles
16  so it wouldn't get lost.  But, yeah, as far as the scene
17  has been released, you know, we can -- we can start
18  securing it, that was on her advice, yeah.
19  Q.     Okay.  Before today, had you ever considered that
20  the forks that were used to offload the three bundles that
21  Curtis Kennedy was trying to offload went too far
22  underneath and overextended underneath the second bundle
23  and that that was what caused the load to tip over?
24              MR. THOMPSON:  Object to form.
25  ///
```

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

BY MR. WRIGHT:

Q.    Did you ever make --

A.    Or experts, I'm sorry.

Q.    Okay. Did you ever make this photograph or notify the TOSHA people that came out that these marks existed on the bottom of this when they were doing their investigation?

A.    I did not make that photograph, and I did not noti -- I did not direct TOSHA on how to complete their investigation.

Q.    Okay. Did you tell them about these marks that were now over in a new place because those two bundles had been moved before they got there?

A.    I -- once again, I didn't direct TOSHA's investigation in any way.

Q.    I just want to know if you told them about it. That's all I'm asking.

A.    Not that I can recall.

Q.    Okay. So, to the best of your knowledge, when they made that report, they didn't have the benefit of having seen those marks that are contained in Exhibit 7, correct?

            MR. THOMPSON: Object to form.

            THE WITNESS: They had the benefit of complete -- committing -- com -- completing an investigation thoroughly as they see -- as -- as

1  Q.     Okay.  If there's even anything on there you can
2  fill out related to Mr. McKinney?
3  A.     That is correct.
4  Q.     Okay.  Ms. McKinney's attorney was asking about the
5  wrapping on the bundles and the -- the marks that were on
6  that wrapping.  Did anyone ask Jenkins & Stiles or tell
7  Jenkins & Stiles that they had to keep those materials in
8  any specific place or condition at all?
9  A.     No.  I haven't been told -- I mean, yeah.  I mean,
10 nobody told me that I had to keep that notebook.  I mean,
11 I had to keep that pad, that I had to keep the -- the --
12 the -- these -- those panels were set aside as long as I
13 could have it and --
14 Q.     Did anyone tell Jenkins & Stiles to set those
15 panels aside?
16 A.     No.
17 Q.     As far as you know, you all just did that of your
18 own accord?
19 A.     Yes, trying to preserve it as -- I mean, you just
20 set it aside, keep it separate and --
21 Q.     Did the sheriff tell you to hold onto anything?
22 A.     No.
23 Q.     Did TOSHA tell you to hold onto anything?
24 A.     No.
25 Q.     Did Ms. McKinney's attorneys tell you to hold onto

```
 1  anything, as far as you know?
 2  A.    As far as I know, no.
 3  Q.    Okay.  I think you mentioned you reported this to
 4  your insurance company; is that right?
 5  A.    Yes.  Well --
 6  Q.    Or someone did at Jenkins & Stiles?
 7  A.    Well, once -- as soon as I've engaged Sandy, who
 8  works for Scott, she -- I -- I mean, she was -- I mean,
 9  within ten minutes, somebody from Scott's Insurance was
10  aware of the situation.
11  Q.    As far as you know, did anyone from Jenkins &
12  Stiles contact me, your attorney, or -- or my office
13  directly to engage us for this matter?
14  A.    No, that would have been done completely separate.
15  I think you're -- yeah, I don't know.  I don't know the
16  relationship.
17        We -- Sandy was aware, and it went from there.
18  Q.    Okay.  You just reported it to the insurance
19  company and let them handle it?
20  A.    Yes.
21  Q.    Or, I guess, you told Sandy, and, I guess, she's
22  your -- she works for your insurance agent.  Is that what
23  Scott is?
24  A.    Yeah.  I think that's the agent, yeah.
25  Q.    Okay.  Did you have any control over TOSHA's
```