# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| ALBERTA LOUISE PERRY, surviving spouse and next kin of VINCENT MCKINNEY, deceased; | ) ) ) | |
| | ) | |
| Plaintiff, | ) | 3:21-CV-414-KAC-JEM |
| | ) | |
| v. | ) | |
| | ) | |
| JENKINS & STILES, LLC; | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the Court on (1) Defendant Jenkins & Stiles, LLC's "Motion for Partial Summary Judgment on Applicability of Tenn. Code Ann. § 29-39-102(h)" [Doc. 316]; (2) Defendant's "Motion for Partial Summary Judgment on Plaintiff's Claims of Direct Negligence and Negligence *Per Se*" [Doc. 319]; (3) Plaintiff Alberta Louise Perry's "Motion for Partial Summary Judgment on Certain Affirmative Defenses" [Doc. 322]; (4) Plaintiff's "Motion for Partial Summary Judgment on Regarding Tenn. Code Ann. § 29-39-101 et, seq." [Doc. 323]; and (5) Plaintiff's "Motion to Withdraw" her Motion for Summary Judgment regarding application of Section 29-39-101 et seq. [Doc. 333]. For the reasons below, the Court (1) **GRANTS** Defendant's Motion regarding application of Section 29-39-102(h) [Doc. 316]; (2) **GRANTS in part** Defendant's Motion regarding direct negligence and negligence per se [Doc. 319]; (3) **GRANTS in part** Plaintiff's Motion for Partial Summary Judgment on certain affirmative defenses [Doc. 322]; and (4) **GRANTS** Plaintiff's Motion to Withdraw [Doc. 333].

# I.   Background[1]

## A.  Undisputed Facts

In April 2021, Curtis Kennedy served as Defendant's Jobsite Superintendent for the construction of a U-Haul storage facility in Knoxville, Tennessee [*See* Doc. 319-2 at 9 (Deposition of Curtis Kennedy ("Kennedy Dep.") 14:13.  Kennedy had worked for Defendant since 2014 [*Id.* at 12 (Kennedy Dep. 40:3-11)].  He previously worked as a jobsite superintendent and company manager for other constructions companies in Knoxville [*Id.* (Kennedy Dep. 40:7-25)].

Kennedy has operated forklifts, including the one at issue in this case, since 1979 [*Id.* at 7-8 (Kennedy Dep. 8:7-9:24)].  He was most recently recertified as a forklift operator in 2020 after completing training providing by Sandy Redmond, a Risk Performance Specialist for Defendant's insurance agency [Docs. 319-4 (Kennedy training certification), 319-5 at 10 (Deposition of Sandy Redmond ("Redmond Dep.") 10:5-25)].  Redmond herself has experience operating a forklift [*See* Doc. 343-3 at 10 (Redmond Dep. 12:10-23)].  Kennedy was trained using "Forklift Workshop for Construction," which covers the characteristics of forklifts; dealing with jobsite hazards such as pedestrians and poor visibility; inspecting, operating, and maneuvering the forklift; picking up and placing loads; attachments; and parking the forklift [*See* Doc. 343-4 (Forklift Workshop for Construction Operator's Handbook)].  Kennedy was not specifically trained on unloading flatbed trailers [Doc. 338-3 at 4 (Redmond Dep. 50:8-21)].

---

[1] This opinion addresses numerous motions for summary judgment [Docs. 316, 319, 322, 323].  In each instance where there are salient facts in dispute, the Court views and describes the facts in the light most favorable to the nonmoving party for each distinct motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2

Vincent McKinney was a truck driver for ClearShine Logistics, LLC ("ClearShine") [*See* Doc. 339-8 at 5 (Deposition of Joshua Sullins ("Sullins Dep."))].[2] He arrived at Defendant's U-Haul jobsite the morning of April 15, 2021 carrying panels of Nucor insulation wrapped with plastic in bundles on a flatbed trailer behind his truck [*See* Doc. 338-4 at 5 (Bullen Report)]. Kennedy and McKinney were the only two men at the jobsite that morning, except for subcontractors working inside the building [*See* Doc. 338-2 at 16 (Kennedy Dep. 74:3)]. Subcontractors generally unloaded their own building materials [*See id.* at 30 (Kennedy Dep. 95:17-96:16)]. But the subcontractor relevant to the insulation panels was unavailable that morning, so Kennedy unloaded McKinney's trailer [*See id.* at 2 (Kennedy Dep. 25:1-24)]. Kennedy had unloaded "three loads almost identical" to McKinney's load the day before [*Id.* at 6 (Kennedy Dep. 29:1-2)].

This time, however, Kennedy "over-engaged the forks [of the forklift], contacted the bundles [of insulation] on the far side, and the bundles fell when" Kennedy "began lifting" [Doc. 273 ¶ 28]. McKinney "died as a result of being struck by" the bundles of insulation [*Id.* ¶ 30]. After McKinney was struck, Kennedy called 911 and exclaimed "I believe I killed this man" [Doc. 339-6 (manually filed)].

After the accident, the local fire department arrived at the jobsite and allowed Kennedy to lift the insulation bundles off McKinney's body [*See* Doc. 144-1 at 20 (Kennedy Dep. 154:14-20)]. Kennedy then contacted Joshua Sullins, Defendant's project manager [Doc. 339-8 at 2 (Sullins Dep.)]. Sullins instructed his office manager to contact Redmond and then went to the scene [*Id.* at 3 (Sullins Dep.)]. After arriving at the scene, Sullins spoke with the police, and

---

[2] The excerpts of the Sullins, Redmond, Michael Johnson, and Steve Humbard deposition transcripts in Docket Number 339 do not contain page numbers [*See* Docs. 339-5 (Johnson), 339-8 (Sullins), 339-9 (Redmond), 339-12 (Humbard)].

3

Redmond "may have been over with" Kennedy [*Id.* at 4, 11 (Sullins Dep.)]. First responders took pictures of the scene and then gave Defendant permission to clear the site [*See* Docs. 144-4 at 4 (Sullins Dep. 66:20-25); 144-1 at 25 (Kennedy Dep. 177:2-11)].

### B. Procedural Background

After extensive litigation, Plaintiff's Third Amended Complaint is operative [Doc. 270]. The Third Amended Complaint presents three sets of allegations [*See* Doc. 270]. *First*, Plaintiff asserts that Defendant is directly liable for negligently hiring, retaining, supervising, training, and entrusting Kennedy with a forklift, and that Defendant is negligent per se for violating regulations implemented under the Occupational Safety and Health (OSH) Act [*See id.* ¶¶ 42-44, 54]. *Second*, Plaintiff asserts that Defendant is vicariously liable for Kennedy's negligence [*See id.* ¶¶ 46-49]. *Third*, Plaintiff asserts that Defendant "intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue" as it relates to Tennessee Code Annotated § 29-39-102(h) [*See id.* at ¶¶ 51, 52]. Specifically, Plaintiff alleges that Defendant (1) altered the jobsite while a Tennessee Occupational Safety and Health Administration (TOSHA) investigator was on his way to investigate, (2) misled the TOSHA investigator "by causing false statements and altered evidence to be given to the investigator," and (3) "failed to preserve the plastic wrap and the cargo bundles, destroyed the plastic wrap, and used the construction materials to construct the building" [*See id.* ¶¶ 32-40].

Defendant answered the Third Amended Complaint and raised several affirmative defenses [Doc. 273 at 11-14]. The Parties also filed various motions.

As relevant here, Defendant moved for summary judgment on (1) the application of Tennessee Code Annotated § 29-39-102(h) to this case [Doc. 316] and (2) Plaintiff's claims for direct negligence and negligence per se [Doc. 319]. Plaintiff (1) moved for summary judgment on certain affirmative defenses Defendant raised [Doc. 322], (2) moved for summary judgment on

4

application of Section 29-39-102 [Doc. 323], and then (3) moved to withdraw her motion for summary judgment on application of Section 29-39-102 [Doc. 333].

### C. Relevant Motions

This opinion addresses various motions [*See* Docs. 316, 319, 322, 323, 333]. As applicable, below the Court describes the disputed facts relevant to each motion for summary judgment in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587.

> i. *Defendant's Motion For Summary Judgment Regarding Application of Section 29-39-102(h) [Doc. 316]*

After McKinney's death, Redmond, a Risk Performance Specialist employed by Defendant's insurance agency, sent Defendant an email with "GUIDELINES FOR THE SPOKESPERSON" instructing it "to establish your company as <u>the</u> source for information with the news media at the outset of a crisis" and "[d]evelop <u>your</u> agenda prior to any interview" [Doc. 339-9 at 9-11 (Guidelines for the Spokesperson)]. Defendant's President Bart Jenkins did not see the email before he entered the jobsite post-accident [Doc. 171-1 at 7 (Deposition of Bart Jenkins ("Jenkins Dep.") 28:3-12)].

After first responders gave Defendant permission to clear the accident site but before TOSHA investigator Michael Johnson arrived, Defendant reeled up the straps McKinney had used to secure his load; moved McKinney's tools, truck, and trailer; and stacked the insulation bundles to the side [*See* Docs. 339-11 at 8-9 (Deposition of Joshua Sullins as Defendant's Corporate Representative ("30(b)(6) Dep.") 175:20-176:23)[3]; Doc. 339-12 at 4 (Deposition of Steve Humbard); 339-4 at 15]. Defendant stated that it took this action because there might be additional deliveries to the jobsite and it wanted to "set this stuff aside so . . . it's not in the thoroughfare of

---

[3] Joshua Sullins was deposed in his individual capacity, [*see, e.g.*, Doc. 339-8], and as Defendant's corporate representative under Rule 30(b)(6), [*see, e.g.*, Doc. 339-11].

5

the jobsite" [Doc. 316-1 at 15-16 (30(b)(6) Dep. 131:6-132:5)]. Defendant denies knowing that a TOSHA investigator was coming when it took this action [*See id.* at 16 (30(b)(6) Dep. 132:6-11)]. Redmond did not advise Defendant "to try to preserve the scene as closely as it existed at the time that this [accident] happened before TOSHA arrived" because it was "not a requirement" [*See* Doc. 344-2 at 8 (Redmond Dep. 45:8-22)].

When TOSHA investigator Johnson arrived, Kennedy told Johnson that (1) Kennedy could see McKinney as Kennedy approached the trailer; (2) Kennedy only tried to lift two bundles, not three; and (3) McKinney was not serving at a spotter during the offloading [*See* Docs. 339-5 at 24-25, 30 (Deposition of Michael Johnson ("Johnson Dep.")); 344-1 at 8-9 (Johnson Dep. 58:17-59:13)]. Kennedy told Johnson "probably something similar" to "I believe I killed this man" [Doc. 344-1 at 10 (Johnson Dep. 159:5-18)]. Johnson assessed that Kennedy was "emotionally distraught," so Johnson did not "want to hold Mr. Kennedy to the account that he's providing false statements when he just went through such a traumatic event" [Doc. 339-5 at 29 (Johnson Dep.)]. Johnson testified that Kennedy did not seem to be hiding anything from him; nor did it seem that Kennedy had been coached [Doc. 144-2 at 9 (Johnson Dep. 66:1-23)].

Johnson discussed with Defendant the possibility that Kennedy overextended the forks of the forklift [*See* Doc. 339-5 at 44-45 (Johnson Dep.)]. However, based on Kennedy's statements, Johnson did not attempt to see the marks the forks left on the wrapped bundles of insulation [*See id.*]. Marks could have indicated that the forks "had penetrated" and contacted those bundles [*See id.* at 9-10]. Marks "would change the scope of the [TOSHA] investigation" but "wouldn't change the outcome" [*Id.* at 16]. When asked why he thought Defendant, or one of its representatives, did not provide a photograph of the marks on the bundles, Johnson "assume[d]" that Defendant "didn't want me to know about it" [*Id.* at 23]. Johnson ultimately testified that "I

6

feel like I've been hoodooed;" "I don't feel like I was provided truthful information through my witness statements and the individuals that I spoke with on-site" [*Id.* at 38-39]. Johnson surmised that (1) "Kennedy was rushed and attempted to load more than he should have;" (2) "at some point after the incident happened, they [Defendant] worked very diligently to ensure that I was unable to find that information;" (3) and Kennedy could not see McKinney when he attempted to lift the insulation bundles off the trailer [*Id.* at 39-40].

Following the accident, the bundles of insulation involved in the accident were set aside and remained wrapped in the plastic wrap containing the marks left by the over-engaged forks [*See* Doc. 316-1 at 8 (30(b)(6) Dep. 118:6-22)]. "Some months later" a subcontractor installed the insulation against Defendant's instructions [*See id.* at 8-12 (30(b)(6) Dep. 118:6-124:15)]. "[O]ne of the subcontractors," not Defendant, "most likely" disposed of the plastic wrap covering the bundles of insulation during that installation [Doc. 339-4 at 3 (Kennedy Dep. 44:9-18)].

> ii. *Defendant's Motion For Summary Judgment On Direct Negligence And Negligence Per Se [Doc. 319]*

According to Redmond, the Occupational Safety and Health Administration (OSHA) requires employers to provide "site-specific training" to employees [Doc. 338-3 at 5-6 (Redmond Dep. 51:18-52:17)]. As relevant here, site-specific training "means the practical training on actually having an employee demonstrate the ability to pick up loads, travel with loads, [and] place loads" using a forklift [*Id.* at 8-9 (Redmond Dep. 54:25-55:6)]. Offloading a flatbed trailer is a type of site-specific training, but Redmond said that OSHA did not require specific training on offloading a flatbed trailer [*Id.* at 5-6, 9 (Redmond Dep. 51:23-52:2, 54:2-6)].

Redmond had provided Kennedy forklift training in her role as a Risk Performance Specialist for Defendant's insurance agency [Docs. 319-4, 319-5 at 10 (Redmond Dep. 10:5-25)]. But Redmond told Defendant's President, Bart Jenkins, that she "ha[d]n't done this type of

offloading" [offloading from a flatbed trailer] before and that "if Curtis Kennedy was going to be the person who was assigned to do this on behalf of Jenkins and Stiles to do this offloading, someone else would have to train him that was familiar with that" [Doc. 338-3 at 14 (Redmond Dep. 111:1-12)]. Jenkins ensured Redmond that Defendant was "going to train" Kennedy "on these specific job site responsibilities" [*Id.* (Redmond Dep. 111:13-19)]. But Defendant did not give Kennedy this training before the accident [Doc. 338-6 at 3 (Jenkins Dep. 22:20-24)].

The day of the accident, Kennedy was relying on McKinney to serve as a spotter as Kennedy unloaded the flatbed trailer [*See* Doc. 338-2 at 17 (Kennedy Dep. 75:10-13)]. "A forklift spotter acts as a second pair of eyes and ears for the driver" [Doc. 338-4 at 24 (Bullin Report) (quotation omitted)]. Kennedy could not recall what exactly he asked McKinney to do, but McKinney was "basically" directing Kennedy "to come on or to move or go ahead" [Doc. 338-2 at 22 (Kennedy Dep. 80:16-21)]. Kennedy could not see McKinney as Kennedy approached the load on the flatbed trailer [*See id.* at 24 (Kennedy Dep. 86:14-16)].

Kennedy attempted to lift three bundles of insulation off the trailer at once [*See* Doc. 339-4 at 9-10 (Kennedy Dep. 86:24-87:6)]. This was contrary to Nucor's guide, which instructed that only one bundle should be lifted at a time [*See* Doc. 338-1 at 45]. Kennedy had not seen Nucor's guide before the accident, nor had Defendant's Project Manager, Sullins [Docs. 338-2 at 34 (Kennedy Dep. 142:13-18), 338-1 at 25-26 (30(b)(6) Dep. 140:6-141:13)]. But Sullins testified that he and Kennedy have seen "installation manuals from insulated metal panels" before, and that "generally you would believe that [Nucor's guide] would be similar" [Doc. 338-1 at 24-26 (30(b)(6) Dep. 92:6-16, 140:6-141:13)]. There is no evidence that Kennedy had ever previously been involved in a workplace accident, and Defendant had no reason "to distrust Curtis Kennedy"

[Doc. 319-1 at 24 (30(b)(6) Dep. 207:16-24)]. This is the first serious accident or death that Defendant has experienced on a jobsite [*See* Doc. 316-1 at 16 (30(b)(6) Dep. 132:6-23)].

### iii. *Plaintiff's Motion For Partial Summary Judgment On Certain Affirmative Defenses [Doc. 322]*

The load on Kennedy's trailer created a "fall [or danger] zone of at least eight feet around the circumference of" the trailer [Doc. 140-1 at 8 (Kennedy Dep. 65:4-9)]. Kennedy told McKinney that he was going to unload the panels and then instructed Kennedy to "finish getting his straps out of the way" [Doc. 148-1 at 3 (Kennedy Dep. 54:6-7)]. As Kennedy was approaching on the forklift, McKinney stood by the back fender of his truck [*See* Doc. 148-1 at 3-4 (Kennedy Dep. 54:19-55:4]. McKinney gave Kennedy the "all clear" to approach the trailer and offload the bundles [*See id.* at 5 (Kennedy Dep. 70:2-4); Doc. 148-3 at 1-2 (Statement of Robert Hutton)]. McKinney then "walked into" the fall or danger zone where the insulation bundles fell [*See* Doc. 322-1 at 11 (Kennedy Dep. 114:4-16)].

### iv. *Plaintiff's Partial Motion For Summary Judgment On Section 29-39-102 [Doc. 323] And Her Motion to Withdraw [Doc. 333]*

Plaintiff also moved for summary judgment on the application of Section 29-39-102 to this case [*See* Doc. 323]. But she subsequently moved to withdraw her motion, stating that there are questions of fact that preclude summary judgment [*See* Doc. 333 at 1]. Defendant did not oppose Plaintiff's request to withdraw the Motion, but it asked that the "Court not strike or withdraw its [Defendant's] Response in Opposition" [*See* Doc. 348 at 2 (citing Doc. 335)].

## II. <u>Analysis</u>

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jackson v. United States Postal Serv.*, 149 F.4th 656, 666 (6th Cir. 2025). For each motion for summary judgment filed, the Court

9

views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences from those facts in the nonmoving party's favor. *See Matsushita*, 475 U.S. at 587; *Jackson*, 149 F.4th at 666. The moving party bears the burden of showing that no genuine dispute of material fact exists. *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 517 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). Once a moving party has done so, "[t]o survive summary judgment, the nonmoving party must present significant probative evidence putting the material facts in doubt." *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (cleaned up).

### A. Defendant Is Entitled To Summary Judgment On Application Of Tennessee Code Annotated § 29-39-102(h) [Doc. 316].

Defendant moves for summary judgment on application of Tennessee Code Annotated § 29-39-102(h) to this case [Doc. 316]. Defendant argues that no reasonable jury could conclude from the evidence that it intentionally falsified, destroyed, or concealed any evidence; that any such evidence was material; and that it took action for the purpose of evading liability [*See* Doc. 318 at 2]. In opposition, Plaintiff argues that the issue must go to a jury, [*see* Doc. 339 at 4-6], and that based on this evidence, a jury could reasonably infer that Defendant "engaged in a deliberate and systematic effort to evade liability," [*id.* at 16].

Tennessee generally caps noneconomic damages for an injury at $750,000. *See* Tenn. Code Ann. § 29-39-102(a)(2). But under Section 29-39-102(h), the general cap does not apply "[i]f the defendant intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue." Tenn. Code Ann. § 29-39-102(h)(2). Section 29-39-102(i) provides that "[i]f there is a dispute of fact, the trier of fact, by special verdict, shall determine whether the exceptions set forth in subsection (h) apply to the defendant and the cause of action." Tenn. Code Ann. § 29-39-102(i). The Tennessee

Legislature enacted the relevant portions of Section 29-39-102 in 2011. *See* Tennessee Civil Justice Act of 2011, 2011 Tenn. Pub. Acts Ch. 510, § 10.

As an initial matter, Plaintiff argues that Tennessee law prohibits a court from granting summary judgment on a party's intent or mental state [Doc. 339 at 4-6]. But "[w]hether summary judgment is appropriate is a question of federal law, not state law." *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 607 (6th Cir. 2013). And even under Tennessee law, intent can be "established, as a matter of law, when the evidence is such that reasonable minds cannot differ." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 892 (Tenn. 2019). Under federal and state law, then, only a genuine dispute of material fact regarding mental state precludes summary judgment. *See id.*; Fed. R. Civ. P. 56(a). Section 29-39-102(i)'s admonition reenforces, rather than detracts from, that conclusion—only "[i]f there is a dispute of fact," does the "trier of fact" determine whether the exception applies. *See* Tenn. Code Ann. § 29-39-102(i). There must be a genuine dispute of material fact for the issue of Defendant's intent to go to a jury. So, the Court's inquiry continues.

Neither the Tennessee Supreme Court nor the United States Court of Appeals for the Sixth Circuit has conclusively interpreted Section 29-39-102(h) as relevant here. So, the Court starts with "the natural and ordinary meaning of the language used" in the statute. *See Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019) (quoting *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 185 (Tenn. 2000)). Tennessee courts interpret text by assessing "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *See Richards v. Vanderbilt Univ. Med. Ctr.*, 706 S.W.3d 319, 323 (Tenn. 2025) (cleaned up).

At the relevant time, "intentional" generally meant something "done with the aim of carrying out a given act." *Intentional*, Black's Law Dictionary (9th ed. 2009). Tennessee defined "intentional" in the criminal context as "act[ing] intentionally with respect to the nature of the

conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(21). The term carried much the same meaning in the civil context. Under Tennessee tort law, "the traditional definition of intent . . . denotes the tortfeasor's desire to cause the consequences of his or her actions or the belief that the consequences are substantially certain to result from those actions." *Valencia v. Freeland and Lemm Constr. Co.*, 108 S.W.3d 239, 243 (Tenn. 2003).

"[P]urpose" generally referred to an actor's "objective, goal, or end." *Purpose*, Black's Law Dictionary (9th ed. 2009). In the context of personal jurisdiction, under Tennessee law, "purpose" required direction, rather than simple consequence or awareness. *See State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 751 (Tenn. 2013). Tennessee tort law has described "purpose" as the reason for which an action is taken. *See Starr v. Hill*, 353 S.W.3d 478, 482 (Tenn. 2011).

Here, even viewing the evidence in the light most favorable to Plaintiff, no reasonably jury could conclude that Defendant "intentionally falsified, destroyed, or concealed" any identified record "with the purpose of wrongfully evading liability" in this case. *See* Tenn. Code Ann. § 29-39-102(h)(2). Start with Plaintiff's argument that Defendant altered the accident site while a TOSHA investigator was headed to investigate [*See* Doc. 270 ¶ 32-34]. The site was changed from the time of the accident, but first responders gave Defendant permission to clear the scene [*See* Docs. 144-4 at 4 (Sullins Dep. 66:20-25); 144-1 at 25 (Kennedy Dep. 177:2-11)]. And there is no evidence that Defendant knew that a TOSHA investigator was coming or that Defendant had any obligation to keep the scene as it was for the TOSHA investigator [*See* Docs. 316-1 at 15-16 (30(b)(6) Dep. 131:6-132:11), Doc. 344-2 at 8 (Redmond Dep. 45:8-22)]. There is simply not enough evidence to infer the relevant "intent" and "purpose."

Next consider Plaintiff's assertion that Defendant misled the TOSHA investigator "by causing false statements and altered evidence to be given to the investigator" [Doc. 270 ¶ 37]. To the extent the "altered evidence" is the accident site, the analysis above applies here too. To the extent the "false statements and altered evidence" are the statements of Defendant's employees, Redmond's email with "GUIDELINES FOR THE SPOKESPERSON" cannot reasonably be read to direct concealment or a false narrative or "agenda" [Doc 339-9 at 9-11 (Guidelines for the Spokesperson)]. And there is no evidence that Redmond directed Kennedy to engage in any concealment or false narrative or "agenda" when speaking with Johnson [*See* Doc. 339 at 10]. At most, the evidence provides that Redmond may have been with Kennedy at the site after the accident [*See* Doc. 339-8 at 11 (Sullins Dep.)]. Viewing the evidence in the light most favorable to Plaintiff, Kennedy gave inconsistent responses to relevant questions and at times got things wrong. But that is not enough to infer that Defendant "intentionally falsified, destroyed, or concealed records" with "the purpose of wrongfully evading liability."

Third, consider Plaintiff's assertion that Defendant "failed to preserve the plastic wrap and the cargo bundles, destroyed the plastic wrap, and used the construction materials to construct the building" after the accident [*See* Doc. 270 ¶ 40]. Even viewing the facts in the light most favorable to Plaintiff, it was a subcontractor that acted to "destroy" the plastic wrap and install the insulation bundles, not Defendant [*See* Docs. 316-1 at 8-12 (30(b)(6) Dep. 118:6-124:15); 339-4 at 3 (Kennedy Dep. 44:9-18)]. And that subcontractor acted against Defendant's instruction [*See* Doc. 316-1 at 11 (30(b)(6) Dep. 123:15-22)]. Whatever the wisdom of leaving the wrapped insulation bundles at an active construction site, no reasonable jury could conclude that Defendant "intentionally falsified, destroyed, or concealed" those items when Defendant specifically

13

instructed otherwise.  *See Valencia*, 108 S.W.3d at 243 (describing intent as a "desire to cause" the consequence or result).

Plaintiff's best evidence in support of its theory is Johnson's testimony that he felt "hoodooed" by Defendant and Johnson's surmise that "[Defendant] worked very diligently to ensure that I [he] was unable to find . . . information" about the marks on the bundles and Kennedy's actions that day [Doc. 339-5 at 38-40 (Johnson Dep.)].  But even Johnson, who heard Kennedy's words that day, did not "want to hold Mr. Kennedy to the account that he's providing false statements" given his emotional state [*Id.* at 29].  And to Johnson, Kennedy did not seem to be hiding anything or to have been coached in his responses [*See* Doc. 144-2 at 9 (Johnson Dep. 66:1-23)].  On this record, Johnson's evocative language and surmise are not enough to create a genuine dispute of material fact as to Defendant's "intent" and "purpose" under Section 29-39-102(h).  *See K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (a "party may not avoid summary judgment by resorting to speculation [or] conjecture" (quotation omitted)).  So, Defendant is entitled to summary judgment.

### B. Defendant Is Not Entitled to Summary Judgment On Plaintiff's Negligent Training Claim But Is Entitled to Judgment On Her Other Direct Negligence and Negligence Per Se Claims [Doc. 319].

Defendant moves for summary judgment on Plaintiff's claims for direct negligence and negligence per se [Doc. 319].  Defendant argues that no reasonable jury could find that Kennedy was unfit for his job, and even if one could, Defendant had no knowledge of a deficiency [*See id.* at 10].  For negligence per se, Defendant argues that Plaintiff cannot maintain her claim under the law [*See* Doc. 321 at 11-16].  Plaintiff opposed, arguing, among other things, that a jury could infer that Defendant was negligent in not providing "job-site specific training" to Kennedy and Defendant was negligent per se for violating OSH Act regulations [*See* Doc. 338 at 8, 18].

*i. Direct Negligence*

Under the law, Plaintiff's direct negligence claims break down into two theories: (1) negligent supervision and (2) negligent training. *See Redwing v. Cath. Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 453-54 (Tenn. 2012) ("The torts of negligent hiring, supervision, and retention all involve essentially the same questions: did the defendant have notice of the wrongdoer's propensity to commit [a harm], authority to prevent the harm, and some duty of care to those who were harmed?" (quotation and citation omitted)). Plaintiff maintains that she also has a viable claim for negligent entrustment [*See* Doc. 338 at 6]. But negligent entrustment "requires proof that a chattel was entrusted to one incompetent to use it with the knowledge of the incompetence." *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 907 (Tenn. 1996). Kennedy may have been negligent, but there is no evidence that he was "incompetent to use" a forklift and that Defendant knew as much [Doc. 316-9 at 7-9 (Kennedy Dep. 8:7-9:20)]. So, that claim fails.

Starting with negligent supervision, to succeed on a negligent supervision theory, a plaintiff must demonstrate that the defendant "could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *Gunter v. Est. of Armstrong*, 600 S.W.3d 916, 929 (Tenn. Ct. App. 2019) (quotation omitted). Here, there is not enough evidence in the record to establish a genuine dispute of material fact regarding whether Defendant should have foreseen how Kennedy's operation of a forklift could result in this accident. *See id.* at 929. Kennedy had decades of experience operating forklifts [*See* Doc. 319-2 at 7-8 (Kennedy Dep. 8:7-9:24)]. He was most recently recertified as an operator the year before the accident [Doc. 319-4 (forklift certification card)]. Apart from this accident, there is no evidence that Defendant should have more been concerned about safety on its jobsites or more closely

15

supervised Kennedy [*See* Docs. 319-1 at 24 (30(b)(6) Dep. 207:16-24); Doc. 316-1 at 16 (30(b)(6) Dep. 132:6-23)].

Plaintiff relies on the Nucor installation guide to attempt to establish an industry standard or custom for offloading panels of which Defendant was aware and which Kennedy breached [*See* Doc. 338 at 2, 8].  But her argument stretches the actual evidence too far.  There is no evidence that Kennedy or Defendant saw the Nucor installation guide [*See* Docs. 338-2 at 34 (Kennedy Dep. 142:13-18); Doc. 338-1 at 25 (30(b)(6) Dep. 140:6-24)].  And even if Defendant "generally . . . would believe that [Nucor's guide] would be similar" to other installation guides, that does not create an industry standard of which Defendant was aware [*See* Doc. 338-1 at 24, 26 (30(b)(6) Dep. 92:6-16, 141:3-13)].  And even if Plaintiff is correct that Kennedy was negligent, she has not identified any "red flags" concerning Kennedy's work that suggest Defendant breached a duty in not more closely supervising him.  *See Gunter*, 600 S.W.3d at 931.  So, Defendant is entitled to summary judgment on Plaintiff's negligent supervision theory.

Plaintiff's negligent training theory fares better.  To succeed, a plaintiff must show the traditional elements of negligence—duty, breach, causation, factual and legal cause, and injury— and the employer's "knowledge of the employee's unfitness for the job." *Binns v. Trader Joe's East, Inc.*, 690 S.W.3d 241, 254 (Tenn. 2024) (quoting *Doe v. Cath. Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)).  Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that Kennedy was negligent in operating the forklift on April 15, 2021 [*See* Doc. 339-5 at 39-40 (Johnson Dep.) (describing Kennedy's failures)].  But for Kennedy overextending the forks, the bundles would not have fallen from the flatbed trailer, and a reasonable jury could find that Kennedy's actions were a substantial factor in

McKinney's injury.  *See Cotton v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019) (discussing cause-in-fact and legal cause).

Moreover, drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that Redmond made Defendant aware of Kennedy's "unfitness" to perform the specific offloading at issue before the accident and that Defendant failed to train him on that specific task. Redmond's deposition testimony was not always clear, but reading it in the light most favorable to Plaintiff, she told Defendant's President, Jenkins, that she had not done the type of forklift offloading at issue in this case before and that "if Kennedy was going to be the person who was assigned to do this on behalf of Jenkins and Stiles to do this offloading, someone else would have to train him" [Doc. 338-3 at 14 (Redmond Dep. 111:1-12)]. Jenkins ensured her that Defendant was "going to train" Kennedy "on these specific job site responsibilities" [*Id.* (Redmond Dep. 111:13-19)]. But that did not happen before the accident [*See* Doc. 338-6 at 3 (Jenkins Dep. 22:3-6, 20-24)]. Reading this testimony in the light most favorable to Plaintiff, a jury could conclude that Redmond notified Defendant that Kennedy needed additional specific training to perform the offloading of McKinney's trailer on April 15 and Defendant did not give him that training. *See Warren*, 126 F. Supp.3d at 998. This presumes that Defendant knew that Kennedy's work on April 15 would include offloading building materials from a flatbed trailer. A reasonable jury could make that inference from Defendant's control over the jobsite and construction and the fact that Kennedy had unloaded three "almost identical" loads the day before [*See* Doc. 338-2 at 6 (Kennedy Dep. 29:1-2)]. Accordingly, Plaintiff's direct negligence negligent training claim survives.

### ii.   *Negligence Per Se*

To establish negligence per se, a plaintiff must show "(1) the defendant violated a statute or ordinance which imposes a duty or prohibits an act for the benefit of a person or the public;

(2) the injured party to be within the class of persons whom the legislative body intended to benefit and protect; and (3) the negligence was the proximate cause of the injury." *Nelson v. Werner Enterprises, Inc.*, 692 F. Supp. 3d 821, 826 (E.D. Tenn. 2023) (quoting *Weatherly v. Eastman Chem. Co.*, No. E2022-01374-COA-R3-CV, 2023 WL 5013823, at *9 (Tenn. Ct. App. Aug. 7, 2023)). "To trigger the doctrine, the statute [or regulation] must establish a specific applicable standard of conduct." *Id.* (quoting *Weatherly*, 2023 WL 5013823, at *9). Theoretically, then, under Tennessee law, an OSH Act violation "may be conclusive evidence of" "negligence *per se*." *Ellis v. Chase Commc'ns, Inc.*, 63 F.3d 473, 477 (6th Cir. 1995).

Plaintiff's Third Amended Complaint only specifically identifies a violation of "applicable provisions of 29 C.F.R. § 1910 (specifically 1910.178)" as the basis for her negligence per se claim [Docs. 270 ¶ 43(f)]. But Defendant's motion for summary judgment presumes a broader reach [*See* Doc. 321 at 13-16]. Either way, Defendant wins.

*First*, under 29 U.S.C. § 654(a)(1), an employer must "furnish to each of his employees' employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). This "general duty" provision only "imposes a duty upon employers to protect the safety of its own employees." *Ellis,* 63 F.3d at 477. McKinney was an employee of ClearShine, not Defendant [*See* Doc. 339-8 at 5 (Sullins Dep.)]. Accordingly, Defendant owned McKinney no duty under Section 654(a)(1). *See Ellis*, 63 F.3d at 477.

*Second*, Section 654(a)(2) provides that an employer must "comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a)(2). This "specific duty" provision imposes a broader duty "defined with reference to control of the workplace and opportunity to comply with" OSH Act regulations. *Ellis*, 63 F.3d at 477 (6th Cir. 1995). An

18

employer's duty under Section 654(a)(2) extends to employees and independent contractors at the workplace. *See Teal v. E.I. DuPont de Nemours and Co.*, 728 F.32d 799, 805 (6th Cir. 1984). Thus, this could conceivably extend to McKinney.

On this point, Plaintiff first argues that Defendant violated the regulation requiring that "all operator training and evaluation shall be conducted by persons who have the knowledge, training, and experience to train powered industrial truck operators and evaluate their competence" [*See* Doc. 338 at 16-17]. 29 C.F.R. § 1910.178(l)(2)(iii). The record reveals no evidence suggesting that Redmond, who recertified Kennedy in 2020, lacked these regulatory qualifications [*See* Doc. 343-3 at 10 (Redmond Dep. 12:4-23) (describing Redmond's experience)]. Rather, Plaintiff asserts that Redmond "did not train Kennedy on flatbed trailer offloading and had no experience with flatbed trailer offloading" [Doc. 338 at 17]. But the regulation does not require such specific knowledge, training, or experience. *See* 29 C.F.R. § 1910.178(l)(2)(iii). And Plaintiff presents no other evidence or authority that such specific qualifications are required for an operator to have "the knowledge, training, and experience to train powered industrial truck operators." *See* 29 C.F.R. § 1910.178(l)(2)(iii). Thus, this theory of negligence per se fails.

Plaintiff next argues that Defendant violated the requirements for the "initial training" of forklift operators [*See* Doc. 338 at 16-17]. *See* 29 C.F.R. § 1910.178(l)(3). However, the forklift training materials Redmond used to recertify Kennedy addressed all of the subjects required by the regulation [Doc 343-4 at 3-12, 16 (Forklift Workshop for Construction Operator's Handbook)]. Plaintiff more specifically argues that Defendant "failed to follow multiple aspects of this regulation by failing [to] properly train Kennedy in using the JLG telehandler to offload heavy bundles from flatbed trailers" [Doc. 338 at 17]. But Plaintiff again overstates the duty the regulation imposes. This regulation only applies to "initial training." 29 C.F.R. § 1910.178(l)(3).

19

It does not create an ongoing duty to train a forklift operator on every specific forklift for every specific task that may arise. Thus, Plaintiff's negligence per se claim fails, and Defendant is entitled to summary judgment.

### C. Plaintiff Is Entitled To Summary Judgment On Affirmative Defenses One And Eleven But Affirmative Defenses Two and Eight Survive [Doc. 322].

Plaintiff moves for summary judgment on affirmative defenses One, Two, Eight, and Eleven [*See* Doc. 322]. Affirmative Defense One asserts that Plaintiff's allegations in the Third Amended Complain "fail to state a claim" [Doc. 273 at 11]. Affirmative Defense Two states that Plaintiff's damages "were not proximately caused by Jenkins & Stiles" because the "injuries and damages complained of" "were caused by parties, entities, and/or circumstances beyond the control of" Defendant [*Id.*]. Affirmative Defense Eight asserts that McKinney's actions "constitut[ed] a superseding cause" [*Id.* at 13]. And Affirmative Defense Eleven purports to "reserves the right to assert additional affirmative defenses" [*Id.* at 14]. When a plaintiff seeks summary judgment on an affirmative defense for which the defendant bears the burden of proof, the plaintiff must demonstrate that the defendant "failed to make a showing sufficient to establish the existence of an essential element of" the defense. *See HBKY, LLC v. Elk River Export, LLC*, 150 F.4th 480, 486 (6th Cir. 2025) (quotation omitted).

As it relates to Affirmative Defense One, the Court's Scheduling Order [Doc. 276], as amended [Doc. 328], required the Parties to file all dispositive motions by July 21, 2025. Defendant filed two motions for summary judgment, which the Court has adjudicated in this opinion. Defendant may not file any further dispositive motions without leave of Court. To the extent that Plaintiff asks the Court to enforce the Scheduling Order and prohibit Defendant from filing any additional dispositive motion for "fail[ure] to state a claim" at this late point in the litigation, the Court grants Plaintiff's motion.

20

Moving to Affirmative Defense Two, Tennessee applies "a three-pronged test for proximate cause": "(1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Jackson v. Ford Motor Co.*, 842 F.3d 902, 908 (6th Cir. 2016) (quoting *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 611-12 (Tenn. 1994)). Causation, including proximate cause, "is a question for the jury 'unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.'" *See Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 533 (6th Cir. 2014) (quoting *Haynes*, 883 S.W.2d at 612).

Viewing the evidence in the light most favorable to Defendant, McKinney entered the fall or danger zone after giving Kennedy the "all clear" to approach in the forklift and unload the bundles [Docs. 148-1 at 3-4 (Kennedy Dep. 54:6-55:9); 148-3 at 1-2]. Based on this, a reasonable jury could conclude that Defendant was not a proximate cause of McKinney's injury because Kennedy could not have "reasonably" foreseen that McKinney would enter the fall or danger zone after giving Kennedy the "all clear" to unload the bundles. Charles Eroh's testimony does not change the result [*See* Doc. 322 at 11]. Eroh stated that Kennedy "bore some responsibility as the forklift operator in this accident" [Doc. 322-3 at 2 (Deposition of Charles Eroh 136:18-21)]. But that testimony, standing alone, does not establish as a matter of law that Kennedy was a "substantial factor" in bringing about McKinney's harm [*See* Doc. 234 at 10]. *See Jackson*, 842 F.3d at 908. A witness's assessment of "responsibility" is distinctly different than judgment as a

matter of law as to proximate cause. Accordingly, Plaintiff is not entitled to summary judgment on Affirmative Defense Two.

As to Affirmative Defense Eight, to succeed on a superseding cause defense, a defendant must show that (1) the harmful effects of the superseding cause occurred after the original negligence, (2) the superseding cause cannot have been brought about by the original negligence, (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence, and (4) the superseding cause must not be reasonably foreseeable. *Cotton*, 576 S.W.3d at 638 (quoting *Borne v. Celadon Trucking Services, Inc.*, 532 S.W.3d 274, 299 (Tenn. 2017)). Viewing the evidence in the light most favorable to Defendant, a reasonable jury could conclude that McKinney entered the fall or danger zone after Kennedy approached the trailer, that McKinney's entry was not brought about by Kennedy's negligence, that McKinney would not have been injured had he not entered the fall or danger zone, and that McKinney's entry into the fall zone after giving the "all clear" was not reasonably foreseeable to Kennedy [*See* Docs. 148-1 at 3-4 (Kennedy Dep. 54:6-55:9); 148-3 at 1-2]. Thus, Plaintiff is not entitled to summary judgment on Affirmative Defense Eight.

Finally, as to Affirmative Defense Eleven, the deadline to amend a pleading to add any new affirmative defenses has passed [*See* Doc. 103 at 4]. Defendant may not raise any new affirmative defenses now without leave of Court. To the extent that Plaintiff asks the Court to enforce its scheduling orders and prohibit Defendant from raising any new affirmative defenses at this late point in the litigation, the Court grants Plaintiff's motion.

### D. The Court Grants Plaintiff's Motion To Withdraw Her Motion For Summary Judgment Regarding Section 29-29-102 [Doc. 333].

District courts possess the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Dietz v. Bouldin,* 579 U.S. 40, 45 (2016) (quotation

22

omitted). Plaintiff asks to withdraw her motion for summary judgment regarding Section 29-39-102 [*See* Doc. 333]. Defendant does not object to Plaintiff withdrawing this motion, [*see* Doc. 348 ¶ 5], and Plaintiff does not oppose Defendant's response remaining on the record, [*see* Doc. 349 at 1]. Because the Parties agree to this resolution, the Court grants Plaintiff's Motion to Withdraw [Doc. 333] with no opposition. *See* E.D. Tenn. L.R. 7.2. Defendant's Response to this motion for summary judgment [Doc. 335] **SHALL** remain in the record.

## III. Conclusion

For the above reasons, the Court: (1) **GRANTS** Defendant's "Motion for Partial Summary Judgment on Applicability of Tenn. Code Ann. § 29-39-102(h)(2)" [Doc. 316]; (2) **GRANTS in part** Defendant's "Motion for Summary Judgment on Plaintiff's Claims of Direct Negligence and Negligence *Per Se*" [Doc. 319]; (3) **GRANTS in part** Plaintiff's "Motion for Partial Summary Judgment on Certain Affirmative Defenses" [Doc. 322]; and (4) **GRANTS** Plaintiff's "Motion to Withdraw" [Doc. 333][4].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

---

[4] This "Motion to Withdraw" is operative, but Plaintiff also filed an earlier incomplete version of the motion [*See* Doc. 332]. The Court **DENIES** that incomplete motion [Doc. 332] as **moot**.

23